#25389-a-SLZ

**2010 SD 64**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JAMES E. SELLE and
ROSEMARY A. SELLE,                                        Plaintiffs and Appellees,

    v.

JAMES TOZSER,                                              Defendant and Appellant,

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SIXTH JUDICIAL CIRCUIT
GREGORY COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE KATHLEEN F. TRANDAHL
Judge

\* \* \* \*

WALLY EKLUND of
Johnson Eklund Law Office                        Attorneys for plaintiffs
Gregory, South Dakota                            and appellees.

SHEILA S. WOODWARD
STEVEN K. HUFF
ROSS K. DEN HERDER of
Johnson, Miner, Marlow,
 Woodward & Huff, LLC                            Attorneys for defendant
Yankton, South Dakota                            and appellant.

\* \* \* \*

ARGUED ON APRIL 27, 2010

OPINION FILED **07/28/10**

#25389

ZINTER, Justice

[¶1.] James and Rosemary Selle (Selles) sued James Tozser for tortious interference with Selles' business relationship with Frank Tozser, James Tozser's brother. Selles also asserted liability on a theory of civil conspiracy. The jury returned a verdict for Selles in an amount representing the balance of Frank's unpaid promissory note to Selles, prejudgment interest on the unpaid note, and punitive damages. James Tozser (James) appeals the denial of his renewed motion for judgment as a matter of law or new trial. We affirm.

*Facts and Procedural History*

[¶2.] We restate the facts in a light most favorable to the jury's verdict. Between 1990 and 1999, Selles operated a trailer distribution business called Dakota Pacific Inc. (DPI) in Bonesteel, South Dakota. DPI bought, sold, and distributed recreational trailers to dealers in fourteen states. DPI's most profitable products were trailers manufactured by Triton Corporation. Triton products generated over 75% of DPI's gross revenues and profits.

[¶3.] In March 2000, Selles sold DPI to Frank and Barbara Tozser by selling its assets for slightly less than $1,000,000. At the time of sale, DPI was making a net profit of almost $300,000 per year. The franchises between DPI and its trailer manufacturers – particularly the Triton franchise – were critical to the business. Frank testified that he understood the importance of the Triton franchise:

> Q: Clearly, when the purchase of assets agreement was signed . . . you understood if you didn't get those same arrangements with Triton – whether you call it a franchise or relationship or whatever – it was a dead deal, wasn't it?
>
> A: Yes, it was.

Selles testified that without those franchises there was no business. Consequently, the purchase agreement was "contingent upon [Frank] receiving substantially the same territory that [Selles had] with major suppliers: Triton . . . [etc.]."

[¶4.]　　　Frank financed the purchase with a $400,000 loan from CIT Small Business Lending Corporation (CIT), a $300,000 loan from Selles, and a $200,000 loan from his brother James. Both CIT and Selles obtained blanket security interests in all assets included in the sale. Selles subordinated their interest to CIT and executed a "standby creditor" agreement. James's loan was unsecured.

[¶5.]　　　Frank operated the business through his own corporation called Dakota Pacific Industries, Inc. (DPI2). Frank began repaying Selles' promissory note in March 2000, making monthly payments of $3,719.57. In September 2004, Frank's monthly payment was delinquent. In October 2004, Frank brought the note current.

[¶6.]　　　At the same time (October 2004), James formed a limited liability company called Aspen Industries. James testified that he formed Aspen to purchase a building in Woodbine, Iowa. He leased the building to DPI2, and Frank moved DPI2 from South Dakota to Aspen's building in Iowa.

[¶7.]　　　In March 2005, Frank stopped making payments on Selles' note. In December 2005, Frank and James traveled together to Triton's headquarters in Wisconsin so Frank could introduce James to Triton's president and solicit the Triton franchise for Aspen. James conceded that he "asked [Triton] if Aspen Industries could be the distributor for the territory that was – that [DPI2] currently had." In April 2006, Triton granted Aspen the distribution rights for Triton

trailers.[1]  Two months later, DPI2 wound up its business without paying Selles.  At that time, just six years after the sale, DPI2's only remaining assets were appraised at $36,000.  James purchased the assets from a third party for $2,600.[2]

[¶8.]　　　　　Aspen began selling Triton trailers in July 2006, using DPI2's equipment, D.O.T. number, phone numbers, and address.  In fact, almost everything was the same, including use of DPI2's loading forklift, delivery trailers, and business forms.  Faxes, invoices, and sales orders from Frank dated July 1, 2006, to December 28, 2006, reflect that Frank continued selling trailers, but he was doing so for Aspen.  In fact, a July 1, 2006, Aspen sales order listing Frank as the representative stated: "This was originally from a sales order for Dakota Pacific."  A document on Aspen letterhead advised Aspen staff that "Frank and the entire staff are now working for Aspen.  DO NOT SAY—Dakota Pacific has been sold[,] bought out[,] taken over[,] assumed[,] Etc."  In instructing the staff how to answer questions, such as, "Why did Dakota Pacific *change it's* [sic] *Name*?," staff was instructed to say, "I'm not sure.  You will have to speak with Frank." (Emphasis added.)  Selles testified that Frank was a decision maker at Aspen and that Frank was the person who obtained the requisite licensing for Aspen to do business in other states.  Aspen's distribution license application for the State of Colorado indicated Frank was the "President of Aspen."

---

1.　　　Aspen had Triton franchise rights from April 2006 until January 2007.

2.　　　James's attorney, Donald Molstad, testified that CIT sold the assets to a third party and that James bought those assets from the third party.

[¶9.]    Selles subsequently sued Frank for failing to pay the promissory note. Frank confessed judgment, filed for bankruptcy, and the debt was discharged. Selles then sued James for tortious interference and civil conspiracy to tortiously interfere with Selles' business relationship with Frank. Selles sought $104,371.37 in damages, representing the unpaid balance of Selles' promissory note. Selles also sought prejudgment interest and punitive damages.

[¶10.]    Throughout trial, Selles contended that James and Frank "gutted" DPI2. Selles specifically contended that the Triton franchise was critical to DPI2 and that James and Frank "wiggled" the Triton franchise away from DPI2 to provide consideration for James's $200,000 loan. Selles argued that even under bad management with only "a couple franchises," especially the Triton franchise, DPI2 could have repaid Selles' note. But without the Triton franchise, Selles argued that repayment was impossible because the going concern was destroyed. As the circuit court described Selles' argument, "[b]asically, the position of the plaintiffs is that if the Triton relationship would have been in place, that that (sic) in and of itself would have been enough to pay for the note and to make those payments."

[¶11.]    The jury returned a unanimous verdict awarding Selles $104,371.37 for tortious interference. The jury inserted this award on the tortious interference line of the verdict form. Selles had also requested $46,220.67 in prejudgment interest but there was no line on the verdict form for that award. The jury awarded $46,220.67 and inserted that amount on the verdict form's line designated for civil conspiracy. The jury finally awarded $30,000 in punitive damages.

[¶12.] After trial, James moved for a renewed judgment as a matter of law or new trial. James contended that there was insufficient evidence of improper conduct, causation, and damages to support a tortious interference award. He also challenged the legal validity of Selles' civil conspiracy theory. James finally challenged the award of punitive damages.

[¶13.] The circuit court denied James's motions, finding sufficient evidence to support the jury's verdict. The court found that reasonable minds could differ regarding improper conduct, causation, and damages. The court concluded that James's other arguments were without legal merit. James appeals.

*Decision*

[¶14.] "In reviewing a renewed motion for judgment as a matter of law after the jury verdict, the evidence is reviewed 'in a light most favorable to the verdict or to the nonmoving party.'" Alvine Family Ltd. P'ship v. Hagemann, 2010 SD 28, ¶ 18, 780 NW2d 507, 512 (citing Harmon v. Washburn, 2008 SD 42, ¶ 9, 751 NW2d 297, 300). "Then, '[w]ithout weighing the evidence, [the court] must decide if there is evidence which would have supported or did support a verdict.'" *Id.* "Similarly, a motion for new trial will not be granted if the jury's verdict can be explained with reference to the evidence, and the evidence is viewed in a light most favorable to the verdict." *Id.* "Both the motion for renewed judgment as a matter of law and the motion for new trial are reviewed under the abuse of discretion standard." *Id.* ¶ 18, 780 NW2d at 512-13.

*Tortious Interference – Improper Conduct, Causation, and Damages*

[¶15.]      To establish a claim for tortious interference with a business

relationship, a plaintiff must prove:

> 1.  [T]he existence of a valid business relationship or expectancy;
> 2.  knowledge by the interferer of the relationship or expectancy;
> 3.  an intentional and unjustified act of interference on the part of the interferer;
> 4.  proof that the interference caused the harm sustained; and,
> 5.  damages to the party whose relationship or expectancy was disrupted.

Dykstra v. Page Holding Co., 2009 SD 38, ¶ 39, 766 NW2d 491, 499 (citations

omitted).  We first address James's argument regarding the third element, which

requires proof of an "intentional and unjustified act of interference . . . [that was]

improper." *Id*.  In deciding the propriety of interference, the following factors are

considered:

> (a)  [T]he nature of the actor's conduct;
> (b)  the actor's motive;
> (c)  the interests of the other with which the actor's conduct interferes;
> (d)  the interests sought to be advanced by the actor;
> (e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other;
> (f)  the proximity or remoteness of the actor's conduct to the interference; and,
> (g)  the relations between the parties.

*Id*. ¶ 39, 766 NW2d at 499-500 (citations omitted).

[¶16.]      James contends that he could not have "improperly" interfered with

Selles' business relationship because James sought advice of counsel throughout his

dealings with DPI2 and Frank.  *See* Briesemeister v. Lehner, 295 Wis2d 429, 453-

55, 720 NW2d 531, 543-44 (WisCtApp 2006) (noting defendant's reliance on an

attorney's advice precluded the improper motive necessary for a tortious interference claim even if the attorney's advice was incorrect). The record reflects that James and Frank used the same lawyer, Donald Molstad, for their respective businesses. James notes that he sought Molstad's advice on how to start his own distributorship business. James also points out that he consulted Molstad before he bought DPI2's assets, before he approached Triton, and before Frank began working for Aspen. Molstad advised them to maintain arm's-length dealings and to "separate [the] two entities and their conduct."

[¶17.]       Unlike *Briesemeister*, however, there was evidence from which the jury could have found that James engaged in intentional, unjustified acts that were not taken upon the advice of attorney Molstad. The most significant example involved James's disregard of Molstad's advice that James maintain arm's-length dealings and separate the two entities and their conduct. Consistent with this advice, and with respect to the critical Triton franchise, Molstad advised James and Frank that "Jim could, *through Aspen*, deal *directly* with Triton in obtaining a new franchise *on his own* that would not violate the terms of Frank's Dakota Pacific franchise agreement." (Emphasis added.) Contrary to Molstad's advice, James used Frank to acquire the Triton franchise. James's use of DPI2's principal to acquire the franchise was patently adverse to DPI2's interests, and particularly its ability to earn money, continue its business, and pay its debts.

[¶18.]       The jury also heard of other non-attorney advised, non-arm's-length dealings among James, Frank, Aspen, and DPI2. The record reflects that early on, James obtained check-writing authority for DPI2 and "helped out" with that

company. Later, James formed Aspen, purchased a building, and secured DPI2's lease of Aspen's building in Iowa. Then, when Aspen began selling trailers, James had Frank help transfer DPI2's business identity to Aspen, including DPI2's business forms and phone numbers. And, contrary to Molstad's arm's-length dealing advice, there was evidence that on one occasion James and Frank decreased DPI2's accounts receivables for an Aspen sales mistake with a customer. Additionally, although at times James claimed Frank was not an employee of Aspen, Frank signed documents as the president of Aspen and acquired business licenses for Aspen. Essentially, Frank continued to operate in the trailer distribution business, except that the revenues went to James and Aspen rather than DPI2 and its creditors. Finally, there was evidence that James had solicited Frank's cooperation in consideration for the nonpayment of James's $200,000 note. As James conceded regarding his help from Frank in acquiring the Triton franchise:

> [Frank] had borrowed a substantial amount of money from me, you know. I knew that if he ended up in bankruptcy, which he did, that I wouldn't be getting that back. And he was – you know, it was [Frank's] turn to look out for me and basically give me a chance to set up my own business under Aspen.

Because these acts were contrary to the advice of James's counsel, we conclude that the jury could have inferred that James improperly interfered with DPI2's business and Frank's ability to fulfill his obligation to Selles.

[¶19.] With respect to the fourth element regarding causation, James argues that there was insufficient evidence for the jury to have found that James's actions caused damages to Selles' business relationship with Frank. James contends that there was no evidence DPI2 would have succeeded but for James's interference, and

there was evidence that Frank lacked the ability to pay Selles before James acted. James also contends that Aspen's acquisition of the Triton franchise was for a limited period of time negating any chance that the acquisition could have caused Selles' damage.

[¶20.]     There was, however, sufficient evidence to make causation a jury question.  The record reflects that James obtained check-writing authority and began "helping out" early in DPI2's business life.  Additionally, James solicited Frank's help in acquiring the Triton franchise before DPI2 wound up its business affairs.  The Triton franchise was extremely profitable.  Triton provided 75% of DPI's gross revenues and profits, and the jury heard evidence of the Triton franchise's importance.  Frank conceded that the purchase of assets agreement was contingent on Frank acquiring the same arrangements with Triton.  Selles testified that absent the franchises, there was no business.  From the evidence, the jury could have determined that James was involved in improper interference before DPI2 was unable to repay Selles' note.

[¶21.]     With respect to the fifth element regarding damages, James argues that Selles' damages could have been no more than the value of assets available to Selles when those assets were sold by CIT, the first secured creditor.  James points out that the value of those assets was insufficient to pay CIT in full, and therefore, there were no proceeds available for Selles as a second priority creditor.  Because there were no funds available after CIT's debt was partially satisfied, James contends that Selles could not have been damaged.  James also contends that to

calculate damages on Selles' theory (using amount owing on the note) puts Selles in a better position than if James had never interfered.

[¶22.]     James's argument incorrectly assumes that Selles' tortious interference claim was based only on a claim of interference with Selles' rights in collateral. Selles' claim was not so limited. Although Selles' counsel occasionally referred to rights in the collateral, Selles' claim was based on James's intentional interference with a business relationship, a relationship that included Frank's obligation to repay the promissory note. Significantly, the obligation to repay a note is not contingent on the status of a creditor's rights in collateral securing the note. The obligation on a note is to repay money lent, and that obligation exists whether the note is secured or unsecured. In this case, Selles' damages claim was based on Frank's obligation to repay the note irrespective of Selles' rights in DPI2's collateral. Therefore, Selles' damages for interference with the Selles-Frank business relationship were not limited to Selles' rights in collateral securing the note.[3] Such a rule would limit the availability of the tort to secured creditors, a proposition for which James has cited no authority.

[¶23.]     In summary, the jury heard evidence from which it could have found that: James was operating a virtual twin competing company with Frank under the

---

3.     James similarly argues that the tortious interference claim must fail because the Triton franchise was terminable at will, and therefore, Selles had no rights in the Triton franchise for a security interest to attach. We decline to consider this argument for the reasons discussed. Even without an interest in the Triton franchise to which a security interest could attach, the unsecured note between Selles and Frank and Barbara Tozser could nonetheless be improperly interfered with by James.

name of Aspen; James and Frank were involved in each other's businesses notwithstanding their attorney's advice; a critical part of the sale of DPI assets to Frank and Barbara was the relationship with Triton; James took steps to acquire Frank's Triton franchise before DPI2 wound up its affairs; James used Frank to acquire the Triton franchise, an important asset that belonged to DPI2; James acquired all of DPI2's equipment and customer lists; and, in contrast to the assets purchased in 2000 for nearly $1,000,000, James purchased the DPI2 assets in 2006 for approximately $2,600. Although different inferences can be drawn from the evidence, the jury could have inferred that James interfered in Selles' business relationship with Frank and that the interference defeated any chance that Selles' note could be paid by Frank from DPI2. The jury could have further inferred that these acts were improper because James's loan was not repaid, and as James stated, it was Frank's "turn to look out for me." Thus, the jury could have found that James intentionally and wrongfully interfered with the contractual relationship between Selles and Frank. The circuit court did not abuse its discretion in denying James's renewed motion for judgment as a matter of law or new trial on the tortious interference claim.

*Civil Conspiracy*

[¶24.] Selles argued that Frank and James conspired to acquire the Triton franchise and other assets and business previously owned by DPI2. Selles specifically contended that Frank and James were two or more persons whose actions together "were calculated to 'gut' [DPI2] and render it bankrupt and thereby destroy the ability of Frank [and] Barbara Tozser and their company [DPI2]

to pay contract obligations owed to [Selles]." Selles alleged that James's and Frank's conduct constituted a civil conspiracy to tortiously interfere with Selles' business relationship with Frank. On appeal, James argues that a civil conspiracy was impossible as a matter of law. James points out that a civil conspiracy requires two or more persons who conspire to commit a tort. But James argues there was no two-person conspiracy because Frank could not have tortiously interfered with his own contract. *See* Landstrom v. Shaver, 1997 SD 25, ¶ 77, 561 NW2d 1, 17 ("One contracting party does not have a cause of action against the other for conspiring to breach their [own] contract or for wrongfully interfering with its own contract."). This argument requires us to restate the nature and purpose of civil conspiracy.

[¶25.]    Civil conspiracy "is not an independent cause of action, but is sustainable only after an underlying tort claim has been established." Kirlin v. Halverson, 2008 SD 107, ¶ 59, 758 NW2d 436, 455 (quotations and citations omitted). "[T]he purpose of a civil conspiracy claim is to impose civil liability for damages on those who agree to join in a tortfeasor's conduct and, thereby, become liable for the ensuing damage, simply by virtue of their agreement to engage in the wrongdoing." Macomber v. Travelers Prop. & Cas. Corp.*,* 277 Conn 617, 636, 894 A2d 240, 254-55 (2006). In restating the common law of civil conspiracy, the United States Supreme Court explained that civil conspiracy is merely a method of establishing joint liability for the underlying tort.

> [I]t was sometimes said that a conspiracy claim is not an
> independent cause of action, but was only the mechanism for
> subjecting co-conspirators to liability when one of their member
> committed a tortious act. *Royster v. Baker*, 365 SW2d 496, 499,
> 500 (Mo 1963) ("[A]n alleged conspiracy by or agreement
> between the defendants is not of itself actionable. Some

> wrongful act to the plaintiff's damage must have been done by one or more of the defendants, and the fact of a conspiracy merely bears on the liability of the various defendants as joint tort-feasors[.]"). *See Halberstam v. Welch,* 705 F2d 472, 479 (DC Cir 1983) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort.").

Beck v. Prupis, 529 US 494, 503, 120 SCt 1608, 1615, 146 LEd2d 561 (2000).

[¶26.]    Thus, civil conspiracy was only a theory to establish James's vicarious liability for the damages caused by the underlying tort. But in this case the jury found James directly liable for the underlying tort. The jury returned a special interrogatory finding that "Defendant James Tozser intentionally interfere[d] with a business relationship between Plaintiffs James and Rosemary Selle and Frank and Barbara Tozser." Because James was found directly liable for the damages caused by the underlying tort, we need not consider whether he may have also been vicariously liable for those damages under a civil conspiracy theory.

*Damages for Civil Conspiracy*

[¶27.]    James, however, points out that in addition to the $104,371.37 awarded for tortious interference with the promissory note, the jury awarded an additional $46,220.67 on the verdict form line for civil conspiracy. James argues that even if he was liable for civil conspiracy, this damage award is not supported legally or factually, and therefore, we must reverse. We disagree because the jury awarded the $46,220.67 as prejudgment interest on the unpaid note: an element of damages on the underlying tortious interference claim.

[¶28.]    SDCL 21-1-13.1 provides that "[a]ny person who is entitled to recover damages . . . is entitled to recover interest thereon." The jury was instructed that

Selles' damages for tortious interference were not to exceed the unpaid balance of Selles' note and prejudgment interest. The jury was also instructed that it "shall not award damages twice for the same conduct." Pursuant to those instructions, the jury awarded the entire amount alleged to be owing on the note ($104,371.37) on the verdict form line designated for tortious interference. Although the jury also inserted an award of $46,220.67 on the blank for civil conspiracy, the parties do not disagree that $46,220.67 represented prejudgment interest on the note. It is also undisputed that there was no line on the verdict form to place the prejudgment interest award. Thus, there is no question that the $46,220.67 did not constitute an award of additional damages for civil conspiracy. The $46,220.67 was part of the total damages allowable (unpaid balance of note plus prejudgment interest) for the predicate tort of tortious interference. We see no reversible error simply because the jury placed the prejudgment interest award on the civil conspiracy blank of the verdict form. We do not reverse when "the jury's verdict can be explained with reference to the evidence rather than by juror passion, prejudice or mistake of law[.]" Waldner v. Berglund, 2008 SD 75, ¶ 14, 754 NW2d 832, 836.

*Punitive Damages*

[¶29.]     Citing SDCL 21-1-4.1, James contends there was no "reasonable basis" to present a punitive damage claim to the jury because there was no evidence he acted with malice. To submit a punitive damage claim to the jury, the circuit court must find by "clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against." *Id.* "This statute merely requires clear and convincing

evidence to show a *reasonable basis*." Isaac v. State Farm Mut. Auto. Ins. Co., 522 NW2d 752, 761 (SD 1994). Thus, it "is a preliminary, lower-order quantum of proof than must be established at trial." *Id.*

[¶30.]     "Malice is an essential element of a claim for punitive damages[.]" *Id.* Malice can be actual (malice in fact) or presumed (legal malice). *Id.* A showing of either type is sufficient to support punitive damages. We have defined these terms as follows:

> Actual malice is a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will towards that person. . . . Presumed, legal malice . . . is malice which the law infers from or imputes to certain acts. Thus, while the person may not act out of hatred or ill-will, malice may nevertheless be imputed if the person acts willfully or wantonly to the injury of the other.

*Id.* (internal citations and quotations omitted). Simply doing an unlawful or injurious act is not sufficient to constitute presumed malice. Presumed malice "implies that the act complained of was conceived in the spirit of mischief or of criminal indifference to civil obligations." Dahl v. Sittner, 474 NW2d 897, 900 (SD 1991). "'A claim for presumed malice can be shown by demonstrating a disregard for the rights of others.'" *Isaac*, 522 NW2d at 761 (citation omitted).

[¶31.]     After hearing the trial evidence, the circuit court found "upon clear and convincing evidence that there is a reasonable basis to believe that malicious conduct did occur." Before we will reverse this finding, James "must show the trial court was clearly erroneous." Maryott v. First Nat. Bank of Eden, 2001 SD 43, ¶ 34, 624 NW2d 96, 106.

[¶32.] Tortious interference with a business relationship involves more than mere negligence. As previously noted, the claim requires an "intentional and unjustified act of interference" that is "improper." *Dykstra*, 2009 SD 38, ¶ 39, 766 NW2d at 499. The evidence presented in this case was sufficient to support this element of tortious interference and to support the presumed malice necessary to submit the punitive damages claim to the jury. Selles presented evidence that James was counseled to maintain arm's-length dealings between his company and Frank's company due to DPI2's creditors, including Selles. Notwithstanding this advice and knowledge of Frank's obligation to Selles, the jury could have inferred that James solicited Frank's cooperation in consideration for the nonpayment of James's $200,000 note. Further, James operated a twin competing company with Frank, James used Frank to acquire DPI2's most lucrative franchise, and James used Frank to decrease DPI2's accounts receivables for mistakes made by Aspen. Moreover, James used Frank to acquire DPI2's phone numbers and business forms for Aspen and allowed Frank to continue his trailer sales business, only doing so for Aspen. Considering the evidence as a whole, a jury could have found that James acted "willfully or wantonly to the injury of [Selles]" and "demonstrat[ed] a disregard for the rights of others." *See Isaac*, 522 NW2d at 761. Because evidence of presumed malice is sufficient to support punitive damages, the circuit court was not clearly erroneous in finding a reasonable basis for submitting the punitive damage claim to the jury.

[¶33.] Affirmed.

#25389

[¶34.] GILBERTSON, Chief Justice, and KONENKAMP, MEIERHENRY, and SEVERSON, Justices, concur.