BRIGHT, Circuit Judge.
Following a bench trial, the district court found third-party plaintiff-appellant Qwest Communications Corporation (Qwest) failed to prove its claims for intentional interference with a business relationship, unfair competition, and unjust enrichment against third-party defendant-appellee Free Conferencing Corporation *893 (FC).[1] Qwest appeals. We affirm the district court on the claims for intentional interference with a business relationship and unfair competition. We reverse and remand on the claim for unjust enrichment,
I. BACKGROUND
Qwest is a long-distance telephone service provider, referred to as an interex-change carrier (IXC). Sancom, Inc. (San-com), the original named plaintiff, is a local telephone service provider, referred to as a local exchange carrier (LEC), for the Mitchell, South Dakota, area.
When IXCs like Qwest transmit calls from one local area to a different’ local area, they pay fees to the LEC in each local area in order to compensate the LEC for delivering, or “terminating,” the call locally on the LEC’s infrastructure. These fees are typically paid on a per-minute basis, so the longer the call the more the IXC must pay the LEC.
Federal laws and regulations govern the contractual relationship between the IXC and the LEC. The Communications Act of 1934 requires the LEC to file with the Federal Communications Commission (FCC) its proposed charges for the IXC, and the FCC must approve this fee, called a tariff. 47 U.S.C. § 203(a). Unless specified in this tariff, the LEC may not otherwise charge the IXC a fee for terminating calls to local customers under its tariff rate. Id. at § 203(c). LECs may, however, receive some compensation from IXCs for calls they deliver to non-customers. Qwest Commc’ns Corp. v. Farmers & Merchants Mutual Telephone Co., 24 F.C.C. Rcd. 14801, 14812 n.96 (2009) (hereinafter Farmers II).
The terms of Sancom’s tariff authorized it to charge IXCs, including Qwest, more than three. cents per minute for calls it delivered to an “end user,” which the tariff defined as an individual or other entity “which subscribe[d] to the services” San-com offered. (Appellant’s Appendix pp. 532, 535, Sancom Tariff § 2.6 (defining an “end user” as “any customer of an interstate or foreign telecommunications service that is not a carrier” and a “customer” as an individual, company, or other entity “which subscribes to the services offered under this tariff’)). Therefore, if Sancom did not deliver a call to -an individual-or entity which subscribed to its services, ■ it could not charge IXCs under the terms of the tariff for terminating the call.
In 2004, FC, a company that provides conference calling services to its customers free of charge, hired Darin Rohead, operating as PowerHouse Communications, to find LECs that would be interested in contracting with FC to host its conference call bridges. Rohead identified Sancom and drafted a contract that the parties' later signed.
Under the terms of the contract, San-com agreed to host FC’s conference call bridges on its premises in Mitchell, South Dakota. FC guaranteed its conference call bridges would increase call traffic to San-com’s service area by a minimum number of minutes per month. In return, Sancom agreed to pay FC a “marketing fee” of 2.5 cents for each minute of call traffic that terminated at FC’s conference call bridges.
Although unwritten in the contract, FC knew Sancom would charge the IXCs under its tariff for each minute of call traffic it terminated at FC’s conference call bridges. The contract was therefore de *894 signed to take advantage of the tariff system: FC would increase the volume of call traffic- IXCs delivered to Sancom’s service area; Sancom would bill IXCs under its tariff for the increased traffic; and Sancom would pay FC a per-minute “marketing fee,” effectively splitting the revenues from the increased traffic. While FC knew this contract would take advantage of the tariff system, the district court found FC President David Erickson credible when he testified that he did not know the arrangement was unlawful, he did not intend to premise his business model on an unlawful source of revenue, and he would have taken any steps necessary to comply with the law.
FC’s call bridges heavily increased call traffic to Sancom’s service area. From March to April 2005, Sancom terminated roughly 3.7 million minutes of FC traffic. By the end of 2007, that number jumped to roughly 50 million minutes of FC traffic per month. In 2007 and the first half of 2008, FC traffic accounted for 98%. of San-com’s overall traffic. During this time period, Sancom terminated roughly 686 million minutes of FC traffic and only 14 million minutes of traffic for all other customers. The FC traffic never interfered with San-com’s service to the other customers.
Today, it is well-settled that an LEC cannot bill an IXC under its tariff for calls “terminated” at a conference call bridge when the conference calling company does not pay a fee for the LEC’s services. But when FC and Sancom first entered into their contract, this issue had not been litigated. The FCC first considered this issue in 2007. Qwest Commc’ns Corp. v. Farmers & Merchants Mutual Telephone Co., 22 F.C.C. Rcd. 17973 (2007) (hereinafter Farmers I).[2] In Farmers I, the FCC held that a conference call company could qualify as an “end user” under the terms of an LEC’s tariff as long as it paid the LEC a subscription fee for its services, even if the LEC, in turn, paid the conference call company a marketing fee that exceeded the subscription fee. Id. at 17987-88. Therefore, even if the conference call company received a net payment from the LEC, it could still qualify as an “end user,” and the LEC could charge the IXC under its tariff for traffic that terminated at the conference call bridge. Id at 17988.
Following Farmers I, Qwest filed a motion to reconsider with the FCC, asking it to revisit its holding in light of newly discovered evidence that the conference call companies were not actually paying a subscription fee to the LECs. See Farmers II, 24 F.C.C. Rcd. at 14801. The FCC granted Qwest’s motion, and in November 2009 it held that an LEC could not charge an IXC under its tariff for calls delivered to a conference call bridge when the conference call company did not pay a fee to subscribe to the LEC’s services. Id. at 14812-13. The FCC, however, indicated in a footnote that the LEC was not “precluded from receiving any compensation at all for the services” it provided to the IXC. Id. at 14812 n.96.
II. PROCEDURAL BACKGROUND
Prior to Farmers I, Qwest stopped paying Sancom access charges, and on October 9, 2007, Sancom sued Qwest to recover the charges, advancing a handful of different legal theories. Qwest filed counterclaims against Sancom and also claims as a third-party plaintiff against FC for unfair competition, tortious interference with con *895 tract, civil conspiracy, and unjust enrichment.
After the FCC decided Farmers II, the district court referred three issues to the FCC: (1) whether Sancom violated its tariff by charging Qwest for calls that terminated at FC’s call bridges; (2) whether Sancom was entitled to some compensation from Qwest for these calls even if it could not bill Qwest under its tariff; and (3) if so, what rate Sancom could charge Qwest for those calls. The FCC found FC was not an “end user” because it did not subscribe to Sancom’s services, and therefore Sancom could not bill Qwest ünder its tariff for calls that terminated at FC’s bridge. The FCC reserved ruling on the remaining two issues. Qwest subsequently settled with Sancom on all claims for an undisclosed amount.
In May 2014, Qwest and FC proceeded to trial before the district court. Following the bench trial, the district court issued an order and entered judgment in favor of FC on all claims. Qwest filed a motion to vacate judgment, which the district court denied on June 5, 2015. Qwest timely appealed.
III. DISCUSSION
Qwest appeals the district court’s judgment on its claims of intentional interference with a business relationship, unfair competition (via FC’s inducement of regulatory violations), and unjust enrichment. “In reviewing a judgment after a bench trial, we review the district court’s factual findings and credibility determinations for clear error, and its legal conclusions de novo.” Affordable Cmtys. of Mo. v. Fed. Nat’l Mortgage Ass’n, 815 F.3d 1130, 1133 (8th Cir. 2016) (citing Fed. R.. Civ, P. 52(a)(6)). “We will overturn a finding of fact only if it is not supported by substantial evidence, it is based on an erroneous view- of the law, or we are left with a definite and firm conviction that an error has been made.” Id.
A. Intentional Interference with a Business Relationship
Qwest argues the district court erred when it entered judgment in favor of FC on its claim for intentional interference with a business relationship. Under South Dakota law,[3] the plaintiff must prove five elements for a claim of intentional interference with a business relationship: “(1) [T]he existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an intentional and unjustified act of interference on the part of the interferer; (4) proof that the interference caused the harm sustained; and, (5) damages to the party whose relationship or expectancy was disrupted.” Selle v. Tozser, 786 N.W.2d 748, 753 (S.D. 2010) (alteration in original). The parties dispute only the third element: whether FC committed "an intentional and improper act of interference. ’
To determine when interference is improper, South Dakota courts weigh a handful of non-exhaustive factors, referred to as the Gruhlke factors: “(a) [T]he nature of the actor’s conduct, (b) the actor’s motive, (c) the interests. of the other with which the actor’s conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor’s conduct to the interference, and (g) the rela *896 tions- between the parties.” Gruhlke v. Sioux Empire Fed. Credit Union, 756 N.W.2d 399, 408 (S.D. 2008). Motivation of personal gain generally is not enough to satisfy the improper interference requirement. Id. at 408 n.13.
The district court considered the Gruhlke factors and found Qwest did not meet its burden to prove FC’s interference was improper. It highlighted that FC President David Erickson credibly testified that he did not intend to cause San-eom' to breach its tariff; FC’s motivation to maximize its own profits was not improper; and FC’s interests were not inconsistent with the societal interests in the tariff regulatory system. Qwest Commc’ns Corp. v. Free Conferencing Corp., No. Civ. 07-4147, 2014 WL 5782543, at *10 (D.S.D. Nov. 6, 2014).
Qwest argues the district court erred when it found FC’s interference was not improper, because the FCC’s finding, on referral from the district court, that FC’s business model was “intentionally designed to take advantage” of Sancom’s tariff mandates a finding of impropriety. While this FCC finding relates to only some of the Gruhlke factors, Qwest argues that under South Dakota law and the Restatement (Second) of Torts, which South Dakota follows, it is unnecessary to weigh any other factors where case law has developed a “more or less crystalized rule,” (App. Br. p. 44 (“The court erred because no further analysis was necessary once the district court found FC’s business was premised on interjecting itself into Sancom’s tariff billing of Qwest, and thereby inducing a contract breach.”) (citing Restatement (Second) of Torts § 767 cmt. j (1979))). The “more or less crystalized rule” that FC violated, Qwest argues, is that a business model premised on inducing a party to breach its contract is tortious interference per se.
We have found no such per se rule under South Dakota law, let alone a rule so ingrained in South Dakota case law that it can be characterized as “more or less crystalized.” Rather, the South Dakota Supreme Court is clear: even when the defendant induces the third party to breach its contract, the court must examine whether the inducement is wrongful. See Lien v. Nw. Eng’g Co., 73 S.D. 84, 39 N.W.2d 483, 486 (1949) (“When one has knowledge of the contract rights of another, his wrongful, inducement of a breach thereof is a willful destruction of the property of another and cannot be justified on the theory, that it enhances and advances the business interests of the wrongdoer.”) (emphasis added). This inquiry turns on the particular facts of each case. Gruhlke, 756 N.W.2d at 408.
Under these circumstances, we agree with the district court that FC did not act with an improper purpose when it contracted with Sancom, because FC was simply attempting to take advantage of the uncertain regulatory scheme at the time. When FC entered into its contract with Sancom in 2005, it was unsettled whether its business model complied with the tariff system. FC had a legitimate argument that it could be considered an “end user,” and thus Sancom could bill Qwest under its tariff-for calls delivered to FC’s call bridges, because FC “paid” for Sancom’s services through a netting agreement: Sancom charged FC for subscribing to its services; FC charged Sancom for technical support and marketing; and the net result was that Sancom owed FC money. It was not until the FCC’s Farmers II decision in 2009 — after this lawsuit began — that it appeared that FC’s business model violated Sancom’s tariff. Significantly, the district court found credible Erickson’s testimony that he did not know FC’s business model *897 violated the tariff and that he intended to comply with the tariff system.
FC’s business model was not based on inducing Sancom to breach its tariff. Instead, it was based on its reasonable, credible belief that it was taking advantage of the tariff system within the terms of the law. Under these circumstances, FC was not acting with an improper purpose, because it reasonably believed it was complying with the law as it existed at the time it contracted with Sancom. See Briesemeister v. Lehner, 295 Wis.2d 429, 720 N.W.2d 531, 543-44 (Ct. App. 2006) (noting defendant did not act with improper motive when it relied on advice of attorney, even if the attorney’s advice was incorrect), cited with approval in Selle, 786 N.W.2d at 753. FC’s innocent motive distinguishes this case from other cases where the South Dakota Supreme .Court found the interferes acted with an improper purpose. See, e.g., St. Onge Livestock Co., Ltd. v. Curtis, 650 N.W.2d 537, 542 (S.D. 2002) (finding issue of material fact on impropriety of interference where party disregarded express advice of counsel about legality of employment contract and recruited competitor’s manager).
Judge Murphy argues that the district court committed clear error when it held that- FC did not act with; improper purpose, based largely on the district court’s finding that Erickson was credible when he testified that he did not know FC’s business model violated - Sancom’s tariff and that he intended to comply with the law. First, Judge Murphy argues this credibility finding was internally inconsistent with the district court’s finding that FC’s business model was “specifically designed” to take advantage of the tariff. Second, Judge Murphy argues Erickson’s intent was irrelevant, because FC had actual knowledge it was interfering with San-com’s contract with Qwest.
This argument rests on the flawed premise that FC knew it was acting unlawfully. The FCC’s finding that FC designed its business model to take advantage of the tariff system does not compel the conclusion that FC knew it was acting unlawfully. There is nothing unlawful about a company acting to take advantage of a favorable regulatory scheme,. which FC believed it was doing. While Sancom’s billings to Qwest were later deemed “unlawful,” this conclusion was not apparent to FC at the time it contracted with San-com.. FC thought its.contract with Sancom fit withio Sancomis tariff. In hindsight, FC was wrong. But. at the time, it did not know it was wrong.
This difference is important, because tortious interference with a business relationship is an intentional tort, and therefore a defendant must knowingly interfere with the contract to be liable. Restatement (Second) of Torts § 766 cmt. j. (1979) (noting that element of intent may be satisfied where actor “knows that the interference is certain or substantially certain to occur as a result of his action”). Indeed, in each case Judge Murphy cites the defendant knew its actions would interfere with the plaintiffs business relationship at the time it engaged in the interference. See Lien, 39 N.W.2d at 489 (finding defendant had sufficient intent to interfere with a business relationship where it mined a third party’s land even though it had knowledge of plaintiffs contractual rights to the rock on the land); ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op., 276 F.3d 957, 972-73 (8th Cir. 2002) (finding actor acted with sufficient intent for claim of tortious interference where it had knowledge that its accounting advice would undercut the defendant’s, contractual right to receive royalties). By contrast, FC did not know that its business model would cause San-com to breach its contract. It simply be *898 lieved it was taking advantage of the regulatory system. Therefore, FC did not act with an improper motive.
We affirm the district court’s judgment that Qwest failed to prove FC acted with an improper purpose.
B. Unfair Competition
Qwest next argues the district court erred when it predicted South Dakota would not recognize FC committed a tort of unfair competition when it induced Sancom to breach its tariff. When a state’s highest court has not spoken on an issue, a federal court must predict what the state court would do if it were called upon to decide the issue. See Nw. Mut. Life Ins. Co. v. Weiher, 809 F.3d 394, 397 (8th Cir. 2015).
Under South Dakota law, the tort of unfair competition itself does not have specific elements, but rather it describes a general category of torts which courts recognize to protect commercial interests. Setliff v. Akins, 616 N.W.2d 878, 887-88 (S.D. 2000). Therefore, to prove the defendant committed the tort of unfair competition, the plaintiff must identify an underlying tortious act the defendant committed. Id.
To identify an underlying tortious act that FC committed, Qwest points to the Restatement (Third) of Unfair Competition, which provides a remedy in tort for harm that results from the “acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public.” Restatement (Third) of Unfair Competition § 1(a)(3) (1995). Qwest argues FC’s business model was based on tortiously inducing regulatory violations, which falls under this section of the Restatement as an act or practice that South Dakota would determine to be actionable as an unfair method of competition.
We disagree with Qwest that South Dakota would recognize a new tort under these circumstances, because an essential component for a claim of unfair competition under South Dakota law is lacking: direct competition. South Dakota recognizes the tort of unfair competition when one company gains an upper hand on its competitor due to an unfair practice. In Raven Industries, Inc. v. Lee, for example, the South Dakota Supreme Court found the defendant committed the tort of unfair competition when it gained a “thirteen-year head start in manufacturing” after it took its competitor’s trade secret. 783 N.W.2d 844, 851 (S.D. 2010). Likewise, in Setliff, the court found a triable issue on whether an employee committed the tort of unfair competition when he breached his duty of loyalty and began competing against his former employer. 616 N.W.2d at 887-88. And cases from other jurisdictions on which Qwest relies also involve unfair competition between direct competitors. See ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc., 249 F.Supp.2d 622, 688-89 (E.D. Pa. 2003) (finding unfair competition where competitor tortiously interfered with contract and gained advantage over direct competitor); N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs., 54 F.Supp.3d 1189, 1233-37 (D.N.M. 2014) (denying defendant’s motion to dismiss- claim of unfair competition where hospital used unfair means to drive competitor out of market).
In this case, FC was not a direct competitor of Qwest and it did not use any unfair methods to gain an advantage over Qwest. We therefore predict the South Dakota Supreme Court would not recognize a tort of unfair competition under *899 these circumstances, and we find the district court properly rejected this new tort.
C. Unjust Enrichment
Finally, Qwest argues the district court erred when it found FC was not unjustly enriched. Unjust enrichment is an equitable remedy, Dowling Family P’ship v. Midland Farms, 865 N.W.2d 854, 860 (S.D. 2015), and we review a district court’s decision to deny an equitable remedy for abuse of discretion. Olivares v. Brentwood Indus., 822 F.3d 426, 429 (8th Cir. 2016). A district court abuses its discretion if it fails to consider a relevant factor that should have been given significant weight, if it considers an improper or irrelevant factor, or if it “commits a clear error of judgment in the course of weighing proper factors.” Aaron v. Target Corp., 357 F.3d 768, 774 (8th Cir. 2004).
To establish a claim for unjust enrichment, the plaintiff must prove (1) it conferred a benefit upon another; (2) the other accepted or acquiesced in that benefit; and (3) it would be inequitable to allow the other to retain that benefit without paying. Dowling Family P’ship, 865 N.W.2d at 862. “[T]he fact that a benefit is retained, enjoyed, and profitably exploited by the recipient, all without compensation, does not necessarily mean that the recipient has been unjustly enriched.” Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. b (2011) (cited with approval in Johnson v. Larson, 779 N.W.2d 412, 416 (S.D. 2010)). Rather, the beneficiary must obtain the benefit “in a manner that the law regards as unjustified.” Id. “[T]he relevant inquiry is whether the circumstances are such that equitably the beneficiary should restore to the benefactor- the benefit or its value.” Hofeldt v. Mehling, 658 N.W.2d 783, 788 (S.D. 2003).
The district court found Qwest did not prove it was entitled to an equitable remedy for unjust enrichment because it would not be inequitable to allow FC to retain the benefit it received. Qwest Commc’ns Corp., 2014 WL 5782543, at *17. The district court noted that FC did not gain any benefit illegally or inequitably — it merely “took advantage of a loophole until the loophole closed.” Id. The district court also noted that FC provided legitimate services in exchange for its payments from Sancom. Id. Finally, the district court found it would not be equitable to allow Qwest to recover money from FC when it already recovered money in its settlement with Sancom. Id.
At this stage, this ruling must be vacated. Here the district court relied on two irrelevant factors. First, the district court incorrectly found FC’s conduct was “neither illegal nor inequitable” because it was simply taking advantage of a loophole until the loophole closed. Id. The phrase “loophole” implies that the Sancom-FC contract was legal prior to the FCC’s decision in Farmers II. But that is not the case. In Farmers II, the FCC held that LECs violated the Communications Act by billing IXCs for calls that terminated at conference call bridges when the conference calling company did not subscribe to the LEC’s services. Farmers II, 24 F.C.C. Red. at 14813. This decision was not merely prospective (that LECs could no longer bill IXCs for this traffic) but retrospective as well (that LECs never could have billed IXCs for this-traffic). Since these billing practices were never legal, no loophole ever existed.
As such, FC was not exploiting a loophole, but rather taking advantage of legal uncertainty. In other words, while FC did not intend to cause Sancom to breach its tariff, it did, in part, cause San-com to breach its tariff. This distinction is crucial, because unjust enrichment is ap *900 propriate where the beneficiary gains a benefit inequitably, even if the beneficiary does not intend to deprive the benefactor of the benefit. See Johnson, 779 N.W.2d at 417-18 (finding unjust enrichment appropriate even where defendant was not a wrongdoer and had “no intent to deprive” the plaintiff of his benefit). Thus, the fact that FC did not know it was inducing a tariff violation is not a defense to Qwest’s claim for unjust enrichment. And even though FC was not itself acting illegally, its conduct might be characterized as inequitable because it retained a benefit based on Sancom’s tariff violation, which it partly caused. By finding FC did not act illegally or inequitably because it took advantage of a “loophole,” the district court may have relied on an improper factor for its denial of relief.
Second, the district court improperly considered Sancom’s settlement payments to Qwest when it found FC was not unjustly enriched. South Dakota measures damages for unjust enrichment based on the amount the beneficiary received unjustly, not the amount the benefactor lost. See Johnson, 779 N.W.2d at 418 (“Unjust enrichment ... allows an award of restitution for the value of the benefit unjustly received, rather than the value of the services provided.”). Since Sancom’s payments to Qwest have no effect on the amount by which FC was enriched, this factor is legally irrelevant to Qwest’s claim for unjust enrichment.[4] Rather, the focus should have been the amount of money FC inequitably received, not the amount of money Qwest has already recovered from Sancom. By denying Qwest’s claim for unjust enrichment due, in part, to the amount of damages Sancom already paid Qwest, the district court may have given undue weight to another legally irrelevant factor.
Thus, we reverse and remand to the district court for reconsideration of whether FC was unjustly enriched. We leave the merits of Qwest’s claim for unjust enrichment to the district court based on the full record.[5]
IV. CONCLUSION
For the foregoing reasons, we conclude the district court properly entered its rulings in favor of FC on Qwest’s claims for intentional interference with a business relationship and unfair competition. However, the district court failed to consider all important factors undergirding the unjust enrichment claim. We therefore vacate the district court’s order on the claim for unjust enrichment and remand to the district court for reconsideration of whether FC was unjustly enriched.
It is so ordered.

. The district court also entered judgment in favor of FC on Qwest's claim for civil conspiracy, which Qwest does not appeal.

. While Qwest was a patty to Farmers I and Fanners II, these cases are unrelated to the current case.

. We apply South Dakota law to Qwest's claims in tort and in equity, as both parties agree. See Platte Valley Bank v. Tetra Fin. Grp., LLC, 682 F.3d 1078, 1082 (8th Cir. 2012).

. We leave to the district court to decide whether Sancom's payments to Qwest may diminish Qwest’s recovery under any other legal theory.

. Judge Shepherd argues FC cannot be said to have gained a benefit inequitably without paying for its value, and therefore it is not liable to Qwest under a theory of unjust enrichment. That matter goes to the merits, which we leave to the district court.