SHEPHERD, Circuit Judge, dissenting.
 

 " '[A]s a federal court, our role in diversity cases is to interpret state law, not to fashion it.' When dealing with an issue of state law we are bound by rulings on that issue from the state's highest court ... regardless of whether we think it wise or in accordance with the supposed national trend. If the [state] Supreme Court or legislature wants to change state law, then they can do so - we cannot."
 

 Simmons Foods, Inc. v. Indus. Risk Insurers
 
 ,
 
 863 F.3d 792
 
 , 798 (8th Cir. 2017) (citations omitted) (quoting
 
 Wivell v. Wells Fargo Bank, N.A.
 
 ,
 
 773 F.3d 887
 
 , 896 (8th Cir. 2014) ).
 

 The district court and the majority depart from this bedrock precept and, contrary to Minnesota law and with minimal explanation, find tortious interference by Free Conferencing Corp. ("Free Conferencing") where it did not induce the breach by Tekstar of its contract with Qwest Communications Company, LLC ("Qwest") and where Tekstar willingly participated in the breach, even preparing the contract and amended contract with Free Conferencing which Qwest now cites as constituting this tortious interference. For this reason, and taking the district court's factual findings as true, Qwest's claim for tortious interference with contractual relations fails, I respectfully dissent.
 

 Under Minnesota law, a tortious interference claim requires five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."
 
 Sysdyne Corp. v. Rousslang
 
 ,
 
 860 N.W.2d 347
 
 , 351 (Minn. 2015) (internal quotation marks omitted). Free Conferencing raises challenges across these elements. But I address only one. I conclude that the district
 court's decision did not properly address the third element: an intentional procurement of the purported breach in this case. Instead, the district court, sanctioned by the majority, collapses the unique contours of Minnesota law into more general tort law principles, effectively fashioning Minnesota law instead of applying it.
 

 In reviewing a bench trial judgment on interference claims, courts "review the district court's factual findings and credibility determinations for clear error, and its legal conclusions de novo."
 
 See
 

 Qwest Commc'ns Corp. v. Free Conferencing Corp.
 
 ,
 
 837 F.3d 889
 
 , 895 (8th Cir. 2016).
 

 The Minnesota Supreme Court has often used the words "procure" and "induce" interchangeably.
 
 See, e.g.
 
 ,
 
 Jensen v. Lundorff,
 

 258 Minn. 275
 
 ,
 
 103 N.W.2d 887
 
 , 890 (1960). Historically, tortious interference in Minnesota (and elsewhere) was meant to guard against scheming and opprobrious commercial conduct. As the Minnesota Supreme Court explained in an early opinion, "[f]raud, misrepresentation, intimidation, coercion, obstruction, molestation, or the willful and intentional procurement of violation of contractual relations are practices which competition does not authorize."
 
 Sorenson v. Chevrolet Motor Co.
 
 ,
 
 171 Minn. 260
 
 ,
 
 214 N.W. 754
 
 , 756 (1927). And so the tort was meant to protect "[f]ull, fair and free competition ... necessary to the economic life of a community" by ensuring that "unlawful means" were not used to "prevent another from obtaining the fruits of his labor."
 
 Johnson v. Gustafson
 
 ,
 
 201 Minn. 629
 
 ,
 
 277 N.W. 252
 
 , 254-55 (1938).
 

 In more recent years, the Minnesota Supreme Court has expanded the range of conduct covered by tortious interference.
 
 See, e.g.
 
 ,
 
 Nordling v. N. States Power Co.
 
 ,
 
 478 N.W.2d 498
 
 , 506 (Minn. 1991) (noting "bad motive or malice may not be an element of the tort of tortious interference"). Even as recent cases have led to a more fluid inquiry, Minnesota still maintains that a defendant must induce the breach of contract.
 
 See
 

 E-Shops Corp. v. U.S. Bank Nat'l Ass'n
 
 ,
 
 678 F.3d 659
 
 , 664-65 (8th Cir. 2012) (noting Minnesota law "expressly" demands "procurement of a breach of contract" for "a tortious interference claim"). Indeed, to require anything less would not only unmoor tortious interference from its historical anchors, but also infringe on the "[l]iberty of contract ... assured by both [Minnesota] and federal Constitutions."
 
 Minn. Wheat Growers' Co-op. Mktg. Ass'n v. Radke
 
 ,
 
 163 Minn. 403
 
 ,
 
 204 N.W. 314
 
 , 315 (1925).
 

 Underscoring how vital inducement is, Minnesota does not recognize tortious interference where the breaching party was a "willing participant[ ]" in the breach.
 
 [11]
 

 Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.
 
 ,
 
 325 N.W.2d 20
 
 , 27 (Minn. 1982). Willing participants voluntarily breach their contract with the plaintiff without any inducement by the defendant.
 
 See
 

 United Wild Rice, Inc. v. Nelson
 
 ,
 
 313 N.W.2d 628
 
 , 632 (Minn. 1982) (rejecting tortious interference claim where "there has been no showing that [defendant] induced [breaching party] to break with [plaintiff]");
 
 Salon 2000, Inc. v. Dauwalter
 
 , No. A06-1227,
 
 2007 WL 1599223
 
 , at *5 (Minn. Ct. App. June 5, 2007) (no tortious interference where defendant "did nothing to induce [breaching party] to breach her agreement with [plaintiff]").
 

 This Court recently addressed an analogous dispute between Qwest and Free Conferencing under South Dakota law.
 

 Qwest
 
 ,
 
 837 F.3d at 896
 
 . Writing for the panel, Judge Bright stressed that, for Free Conferencing's actions to be unlawful, it must have wrongfully induced a breach of contract "by act[ing] with an improper purpose."
 

 Id.
 

 But where, as here, Free Conferencing merely "take[s] advantage" of a regulatory system through a voluntary business relationship, it cannot be said to be "
 
 knowingly
 
 interfer[ing] with the contract" such that liability for an intentional tort is proper.
 

 Id.
 

 at 896-97
 
 .
 

 The district court held that "Tekstar materially breached its tariffs" by billing Qwest for Free Conferencing's traffic. D. Ct. Op. at 66. And Free Conferencing "intentionally induced" this breach, according to the district court, by "enter[ing] into the contract [with Tekstar], direct[ing] its traffic to Tekstar, and requir[ing] that [Free Conferencing] receive telecommunications services from Tekstar for free." D. Ct. Op. at 72-73. At base, the district court reasoned that the breach of the Tekstar-Qwest tariff was caused by the initial Tekstar-Free Conferencing contract. Assuming that is true, the district court still needed to show how Free Conferencing induced Tekstar to enter into their contract.
 

 In its conclusions of law, the district court did not do so. In discussing inducement, it leaned heavily on the fact that Free Conferencing knew about Tekstar's interexchange carrier ("IXC") contracts, including with Qwest, and settlements. But "mere knowledge of [an] earlier contract" has never been "held to be the equivalent of inducement or persuasion or (still less) of fraudulent conduct."
 
 Radke
 
 ,
 
 204 N.W. at 315
 
 (internal quotation marks omitted);
 
 see also
 

 Royal Realty Co. v. Levin
 
 ,
 
 244 Minn. 288
 
 ,
 
 69 N.W.2d 667
 
 , 672 (1955) ("It is not enough that the defendants merely knew of the contractual relationship and obtained its benefits for themselves.").
 
 [12]
 
 The district court also noted that Free Conferencing "proposed that the two companies do business together." However, the recruiting of Free Conferencing by Tekstar was, by then, clearly in keeping with Tekstar's business plan.
 

 Tekstar first started dealing with free conferencing service companies in 2005 and by 2008, Tekstar was fully immersed in the revenue stream they provided. According to the district court, Tekstar had experience with no less than eight free call service companies ("FCSC") by this time.
 
 [13]
 
 In fact, it had a form contract it routinely used with its FCSC partners. And it was hungry for more. Like many searching for greater fortune, Tekstar sent a representative, David Schornack, to Las Vegas. But, it believed he had better odds than most who visit: Schornack was there to attend a conference for FCSCs. As the district court explained, Schornack "attend[ed], in part, to network with new conference calling companies." It was at
 this conference in 2008 that Tekstar was introduced to Free Conferencing.
 

 Fortuitous seating led to the meeting. In a break between panels, Schornack and Free Conferencing's David Erickson, seated next to each other, struck up a conversation. During that conversation, Schornack "outlined ... the benefits of doing business with Tekstar." Tr. 582-83. Erickson was also eager to do business, as the district court notes. Pretty quickly after that conversation, Free Conferencing became the latest in Tekstar's stable of FCSC partners. In April 2008, Free Conferencing signed Tekstar's form contract with a per-minute rate owed on Free Conferencing traffic, along with contact information, simply written in.
 

 In December 2008, however, at Tekstar's behest, Free Conferencing signed an amended contract (also prepared by Tekstar). The amended contract was in response to the settlements Tekstar had reached with IXCs who had become wise to the FCSC model. The amended contract set a differentiated payment schedule based on these settlements. In addition, it ensured Tekstar was only obliged to pay Free Conferencing after it collected from the IXCs.
 

 These facts show that Tekstar was a willing participant in the breach. Start with Schornack's testimony. Recall he was the Tekstar representative who first engaged and negotiated with Free Conferencing. When asked specifically if "Free Conferencing [did] anything to induce, persuade, or encourage Tekstar to do business with Free Conferencing," he replied: "No." Tr. 585. And when asked if Free Conferencing did anything "more than passively provide Tekstar with information about Free Conferencing's business," he, again, replied: "No, I don't think they did anything other than that." Tr. 585.
 

 Critically, nothing in the district court's findings of fact contradicts this testimony. As the district court recounts, the genesis of the Tekstar-Free Conferencing relationship was Tekstar's decision to seek out more FCSC relationships in Las Vegas. The FCSC model had already proven quite lucrative for Tekstar for approximately three years at that point. And when Free Conferencing was ultimately added to Tekstar's roster of FCSCs, as a sign of Tekstar's familiarity with the practice, it was Tekstar's form contract-which, as a standard term, provided that Tekstar would not charge for telecom services-that was signed.
 
 [14]
 
 Further, when the business dynamics changed-when IXCs began demanding below-tariff settlements-Tekstar modified the terms of the contract with Free Conferencing to be more favorable to Tekstar. Given Schornack's testimony and the findings of the district court, we cannot escape the conclusion that Tekstar was, at the least, a "willing participant[ ]" in its breach of the Qwest tariffs with Free Conferencing.
 
 Furlev
 
 ,
 
 325 N.W.2d at 27
 
 .
 

 In sum, the record is devoid of legally sufficient evidence that Free Conferencing induced Tekstar to enter into their initial contract. Qwest's claim, therefore, fails under Minnesota law.
 

 Often, in diversity cases, federal courts are tasked with interpreting and applying state law in areas in which there is little instructive state case law to draw from. But that is not the case here. Minnesota's highest court has spoken about what Minnesota requires for an intentional procurement of a breach necessary to sustain a tortious interference claim. We are duty-bound
 to follow the Minnesota Supreme Court.
 

 Mindful of the duty of a federal court sitting in diversity to apply the law of the state as it is, not as the court may wish it to be, I would reverse the district court's judgment against Free Conferencing.
 

 Contrary to the majority's contention, the argument that Tekstar was a "willing participant" in the breach is fairly included in Free Conferencing's appeal. In its briefing, Free Conferencing included an argument section asserting that "FC Did Not Induce, Procure, Or Otherwise Cause Tekstar to Materially Breach Its Tariff." Br. of Appellant, p. 26.
 

 The district court, citing the Restatement, found that "intent is also established if 'the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action.' " D. Ct. Op. at 71 (quoting Restatement (Second) of Torts § 766 cmt. j (1979) ). But, for this to be true, the Restatement requires some malevolent inducement: "[i]f the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference" is not sufficient for intent. Restatement (Second) of Torts § 766 cmt. j (1979). Regardless, the Restatement is not binding on us; the Minnesota Supreme Court is.
 
 See
 

 Hazen v. Pasley
 
 ,
 
 768 F.2d 226
 
 , 228 (8th Cir. 1985) (emphasizing that a federal court in diversity is bound to apply the "legal mind" of the state's highest court, even if it means reversing the district court).
 

 Free Conferencing suggests the number is as high as 20.
 

 As the district court notes, Free Conferencing also had its own form contract, but that was not used.