# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-2412

_____

Qwest Communications Company, LLC, a Delaware limited liability company,
doing business as CenturyLink QCC

*Plaintiff - Appellee*

v.

Free Conferencing Corp., a Nevada corporation

*Defendant - Appellant*

Audiocom, LLC, a Nevada limited liability company; Global Conference Partners,
a California corporation; Basement Ventures, LLC, a California limited liability
company; Vast Communications, LLC, a California limited liability company

*Defendant*s

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 17, 2018
Filed: September 25, 2018

_____

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

_____

KELLY, Circuit Judge.

This tort action involves land-line telephone services.  In the district court,[1] long-distance carrier[2] Qwest Communications Company LLC (Qwest) succeeded in showing that a free conference call provider, Free Conferencing Corporation (FC), intentionally interfered with its contract with a local carrier[3] called Tekstar.  On appeal, FC claims that it is not liable for tortious interference with Qwest's contractual relationship with Tekstar, and that the district court erred in calculating damages.

## I.

## A.

Qwest is a long-distance land-line telephone service carrier.  When a person places a long-distance phone call, their long-distance carrier connects the call (also called "traffic") to the local carrier where the dialed number is located.  The customer pays their long-distance carrier for the call, and the receiving local carrier in turn bills the long-distance carrier.  The rate, terms, and conditions required to impose these charges on long-distance carriers are generally governed by tariffs filed with the Federal Communications Commission (FCC).  Here, we refer to the contract between Qwest and Tekstar as a tariff.  See generally 47 U.S.C. § 203(a).

Generally, tariffs authorize long-distance carriers like Qwest to route their customers' traffic through other long-distance carriers when doing so would be less

---

[1]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

[2]In the telecommunications industry, this is called an "interexchange carrier" or IXC.  For simplicity, we use the phrase "long-distance carrier."

[3]In the telecommunications industry, this is called a "local exchange carrier" or LEC.  For simplicity, we call these "local carriers."

expensive than transmitting the traffic through their own networks. This practice is called "least cost routing." Whenever least cost routing occurs, the long-distance carrier through which the traffic is routed is entitled to reimbursement from the routing long-distance carrier. For instance, when Qwest least cost routes its traffic through AT&T, AT&T charges Qwest for transmitting that traffic.

One of Qwest's tariffs was with a local carrier called Tekstar. Tekstar services certain rural parts of Minnesota and North Dakota. In rural areas, telecommunications infrastructure has to cover expansive territory despite fewer paying customers. Therefore, rural local carriers often charge long-distance carriers higher rates to complete calls.

Several years before this case began, a new type of company sought to leverage the relationship between long-distance and local carriers: free conferencing companies, of which FC is one. Free conferencing companies sought to increase long-distance traffic to rural local carriers (with their higher tariff rates), thereby making money for the local carriers and themselves. To do this, free conferencing companies would offer conference-calling services to the public—users would sign up (at no charge to the user) to host a conference call on the service. The free conferencing company would then provide the conference-call organizer a number hosted by a rural local carrier. When participants called the free conferencing number, their long-distance carrier would transmit each participant's call to the rural local carrier. The local carrier would then bill the long-distance carrier for all of the conference call traffic, ostensibly pursuant to its tariff. And, pursuant to its contract with the free conferencing company, it would pay the company a fee. Local carriers did not charge the free conferencing companies to place their numbers on their exchange. Tekstar signed its first contract with a free conferencing company (not FC) in 2005. FC began contracting with rural local carriers (not Tekstar) in 2004.

The telecommunications industry is regulated by the FCC; the FCC approves and interprets the terms of tariffs between local and long distance carriers. See generally All Am. Tel. Co., Inc. v. FCC, 867 F.3d 81, 84 (D.C. Cir. 2017). Many tariffs, including the one between Qwest and Tekstar, only allowed the local carrier to bill the long-distance carrier for calls delivered to "end users."[4] After both Tekstar and FC became involved in the free conferencing industry, long-distance carriers began to challenge the legality of the free conferencing business model. The basis for the challenge was this: If the free conferencing companies were not "end users," local carriers could not charge long-distance carriers tariff rates for the free conferencing traffic. See 47 U.S.C. § 203(c); Qwest Commc'ns Corp. v. Free Conferencing Corp., 837 F.3d 889, 893 (8th Cir. 2016). The legal question was, therefore, whether free conferencing companies like FC were "end users." The FCC answered this question twice: first it said yes, then it said no.

In October 2007, the FCC held, in a case we call Farmers I, that free conferencing companies *were* end users under a tariff with Qwest. See Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 22 F.C.C. Rcd. 17973, 17987–88 (2007). That conclusion was based in substantial part on the free conferencing companies' assertions that they "were billed the federal subscriber line charge as well as for local telephone service and rental of floor space in [the local carriers'] central office[s]." Farmers & Merchs. Mut. Tel. Co. v. FCC, 668 F.3d 714, 717 (D.C. Cir. 2011).

In the course of the Farmers I FCC proceeding, a Farmers I litigant asked FC to assist in falsifying documents that would show it was paying fees to the local carriers it worked with. FC declined to do so, but was aware that other free

---

[4] "[T]ariffs define 'end users' as '[u]sers of local telecommunications carriers services who are not carriers.'" In the Matter of AT&T Corp., 28 F.C.C. Rcd. 3477, 3494 (2013).

conferencing companies had agreed to provide falsified billing records. FC was also aware that, in January 2008, the FCC granted in part a motion to reconsider <u>Farmers I</u>, citing allegations "that [the local carriers'] invoices to, and agreements with, the conference calling companies were backdated." <u>Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co.</u>, 23 F.C.C. Rcd. 1615, 1618 (2008).

By early 2008, most long-distance carriers, including Qwest, were refusing to pay for free conferencing traffic. Some long-distance carriers, however, entered settlements[5] with local carriers, whereby the long-distance carrier agreed to pay for free conferencing traffic, but at lower, below-tariff rates. Tekstar settled with AT&T.

In April 2008, FC and Tekstar entered a contract. The contract provided that FC would pay nothing to Tekstar, and that Tekstar would pay FC a "per minute" fee for hosting conference calls on its exchange. When it entered into the contract, FC knew that Qwest was refusing to pay Tekstar for its free conferencing traffic, and that Tekstar's settlement with AT&T meant that most or all of its free conferencing traffic would be least cost routed through AT&T or another long-distance carrier that had settled at below-tariff rates.

Qwest sent Tekstar a Notice of Dispute, expressing the view that the terminating access charges Tekstar was billing it for free conference companies' traffic were invalid under the tariff. Qwest suspected that Tekstar had entered an impermissible agreement with FC (and other companies) for conferencing services. In response, Qwest implemented a new least cost routing protocol for Tekstar's traffic. Instead of least cost routing Tekstar's free conferencing traffic *any time* it was cheaper than transmitting through its own lines, Qwest only least cost routed the traffic when it was at least 50% cheaper to use another long-distance provider's network. Thus, Qwest continued to transmit some of Tekstar's free conferencing

---

[5]Some of these settlements were later determined to be illegal.

traffic (including FC's traffic) on its own network, but continued to refuse to pay Tekstar for it. This is what the parties call the 50 Percent Rule.

Afer reconsideration, in November 2009, the FCC reversed course in an opinion we will call Farmers II. See Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 24 F.C.C. Rcd. 14801, 14806 (2009). The FCC found that free conferencing companies were *not* end users based on "new evidence . . . previously withheld [that] contradict[ed]" the claim that local carriers and free conferencing companies enjoyed "a carrier/customer relationship under the terms of the tariff." Id.[6] Thus, "[t]oday, it is well-settled that a[ local carrier] cannot bill a[ long-distance carrier] under its tariff for calls 'terminated' at a conference call [number] when the conference calling company does not pay a fee for the [local carrier's] services." Qwest, 837 F.3d at 894.

B.

Following Farmers II, Qwest initiated lawsuits against several local carriers and free conferencing companies. This is one of those suits. As relevant here, Qwest sued FC under Minnesota law for tortiously interfering with its contract (tariff) with Tekstar. After a bench trial, the district court found FC liable and awarded Qwest damages. In particular, the court determined that (1) FC knew of the existence of the Tekstar–Qwest tariff, (2) FC knew its free conferencing business model breached the Tekstar–Qwest tariff, (3) FC induced Tekstar to breach its tariff by pursuing the business relationship and negotiating terms that required Tekstar to bill Qwest for impermissible access charges, and (4) FC's interference was not justified.

---

[6]In a later decision, the FCC denied a petition for reconsideration and reaffirmed its determination that free conferencing companies were not end users. See Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co., 25 F.C.C. Rcd. 3422, 3426–27 (2010), petition for review denied, 668 F.3d 714 (D.C. Cir. 2011).

The district court awarded Qwest only "consequential" damages. The court reasoned that direct damages were unavailable because, by the time FC contracted with Tekstar, Qwest was already refusing to pay for free conferencing traffic that Qwest itself delivered. The court did, however, award Qwest close to $1 million in damages, which it said represented the costs that Qwest incurred in least cost routing FC calls to other long-distance carriers. The court concluded that these costs were foreseeable. The court also awarded Qwest attorneys' fees. FC appeals.

II.

On appeal, FC challenges both the district court's liability finding and award of attorneys' fees. We address each in turn.

The parties agree that Minnesota law governs this case. In Minnesota, "[a] cause of action for tortious interference with contract has five elements: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." Sysdyne Corp. v. Rousslang, 860 N.W.2d 347, 351 (Minn. 2015) (quoting Furlev Sales & Assocs., Inc., v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982)). FC argues that it is not liable for tortious interference because it did not induce or procure Tekstar's breach, and even if it had, Tekstar's breach was not material. FC also argues that its agreement with Tekstar was not motivated by an improper purpose, and that Qwest has not proven damages.

Following a bench trial, we review the district court's legal conclusions de novo and its findings of fact for clear error. Meecorp Capital Mks., LLC v. PSC of Two Harbors, LLC, 776 F.3d 557, 562 (8th Cir. 2015). Sitting in diversity, we are bound by the decisions of the Minnesota Supreme Court. See St. Paul Fire & Marine Ins. Co. v. Schrum, 149 F.3d 878, 880 (8th Cir. 1998). When the Minnesota Supreme Court has not yet decided an issue, "it is our responsibility to predict, as best we can,

-7-

how that court would decide the issue." Brandenburg v. Allstate Ins. Co., 23 F.3d 1438, 1440 (8th Cir. 1994).

A.

FC argues first that it did not induce or procure Tekstar's breach.[7] Under Minnesota law, "inducement" is used interchangeably with "procurement." Cf. Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 214-15 & n.2 (Minn. 2014). Phrased in more generic tort law terms, this means the plaintiff must prove that the defendant *caused* the breaching party to breach its contract. Compare id., and Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998) (finding causation when officials of the defendant company met with the breaching employee "and procured the breach of his noncompete agreements by offering him the vice president position that he eventually accepted"), with Furlev, 325 N.W.2d at 27 (finding no causation where the plaintiff was a "willing participant[]" in the breach).

FC contends that, as a matter of law, it could not have caused Tekstar to breach its tariff with Qwest because Tekstar was already breaching the tariff by the time FC and Tekstar contracted in 2008. In FC's view, these earlier breaches mean that no liability can attach to any subsequent breach of the same or a similar kind. But whether or not Tekstar had already breached the tariff with regard to other free conferencing companies does not answer whether FC's interference caused Tekstar to breach its tariff by billing Qwest tariff rates for *FC's* non-tariff services. FC's approach would create perverse incentives whereby an initial act of tortious interference would absolve from liability anyone who induces a similar breach later in time. We see no support in Minnesota law for FC's position.

---

[7]FC makes no affirmative argument regarding the intent portion of this element: *intentional* inducement or procurement.

The district court did not err in finding that FC caused Tekstar to breach its tariff with Qwest. The court held that, "[a]lthough [FC] was not the first [free conferencing company] to pursue its business model with Tekstar, in this litigation Qwest only seeks liability and compensation for the breaches by Tekstar with relation to the minutes . . . for [FC's] traffic." The district court correctly applied the law to the facts; FC caused the breaches for which Qwest seeks compensation.[8]

B.

Next, FC contends that it cannot be liable because Tekstar's breach was not material. FC says that, under Minnesota law, only breaches that amount to non-performance of contractual obligations are material, and it characterizes this case as a relatively straightforward billing dispute. But under Minnesota law, a breach is material if it goes to "one of the primary purposes" of the contract. BOB Acres, LLC v. Schumacher Farms, LLC, 797 N.W.2d 723, 728 (Minn. Ct. App. 2011) ("A material breach 'goes to the root or essence of the contract.'"). The Qwest–Tekstar tariff obliged Tekstar to bill Qwest tariff rates for traffic that qualified under the tariff. The district court did not err in finding that accurate, tariff-authorized billing was one of the primary purposes of the tariff. And FC does not dispute that Tekstar violated the terms of the tariff when it billed Qwest tariff rates for FC's traffic. Nor does it point to any facts from which we might infer that Qwest did not reasonably expect to

_____

[8]In the dissent's view, Tekstar was nothing but a "willing participant" in the breach. Respectfully, we disagree with the dissent's interpretation of Minnesota law and its application to this case. See Kallok, 573 N.W.2d at 362 (finding that plaintiff "easily established" the procurement element where breaching employee was first to approach defendant about a job, and nothing in the record indicated defendant pressured employee to accept it); Furlev, 325 N.W.2d at 27 (holding that the breaching party–as a "willing participant[]"–*may not sue another* for tortious interference with the contract the breaching party voluntarily breached). Morever, FC did not make this argument on appeal and, as a result, neither party briefed the issue.

be billed only for tariff-qualifying traffic. Thus, even if Minnesota law requires a showing of the type of materiality FC urges, we see no basis for reversal.

C.

FC argues that it cannot be liable for tortious interference because its actions were justified. This is an affirmative defense to tortious interference liability; FC bears the burden of proving justification. Kallok, 573 N.W.2d at 362. Justification exists when a defendant's legal interest "is equal or superior to that of [the plaintiff] and where [the defendant's] invasion is made with the honest purpose of fairly bettering [its] own business, trade, or employment, and not for the primary object of destroying another's employment or business." Bennett v. Storz Broad. Co., 134 N.W.2d 892, 897 (Minn. 1965); see also Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994) ("There is no wrongful interference with a contract where one asserts in good faith a legally protected interest of his own . . . ." (cleaned up)). "Ordinarily, whether interference is justified is an issue of fact, and the test is what is reasonable conduct under the circumstances." Kjesbo, 517 N.W.2d at 588.

The district court did not clearly err in finding that FC lacked justification. The district court found that FC entered its contract with Tekstar in April 2008, after being asked to submit false evidence in the Farmers I proceedings, after learning that the FCC relied on falsified records in determining that free conferencing companies were end users, and after the FCC had granted partial reconsideration of Farmers I in light of the falsified evidence. Based on these facts, it was not clear error for the district court to conclude that, prior to contracting with Tekstar, FC was on notice that it was not an end user and that Tekstar would violate its tariff by charging Qwest tariff rates for FC's traffic. We agree with the district court that these facts defeat FC's justification defense.

FC counters that this conclusion is precluded by collateral estoppel. It cites to a similar case from South Dakota in which the district court found that Qwest had failed to show that FC knew its business model was illegal in 2005. See Qwest Commc'ns Corp. v. Free Conferencing Corp., No. CIV. 07-4147-KES, 2014 WL 5782543, at *9–10 (D.S.D. Nov. 6, 2014). FC also points to this court's opinion affirming the district court in that case, where we said: "It was not until the FCC's Farmers II decision in 2009—after this lawsuit began—that it appeared that FC's business model violated [the local carrier's] tariff." Qwest, 837 F.3d at 896. According to FC, collateral estoppel precluded the district court from reconsidering whether FC reasonably relied on Farmers I until Farmers II was decided in 2009. This case and the South Dakota case are undoubtedly similar, but we conclude that collateral estoppel did not bar the district court from reaching a different conclusion on this issue. This case involves different facts, different timing, and different state law. See Ripplin Shoals Land Co. v. U.S. Army Corps of Engineers, 440 F.3d 1038, 1044 (8th Cir. 2006) (noting that collateral estoppel is only appropriate when "the issue sought to be precluded is identical to the issue previously decided"). In the South Dakota case, FC's contract with the local carrier, Sancom, predated Farmers I, and there was no allegation that fraud on the FCC had alerted FC to the probability that its business model was illegal. See Qwest, 837 F.3d at 894. Here, the district court expressly acknowledged our reasoning in Qwest, and carefully distinguished it. We agree with the district court that our previous opinion did not preclude it from concluding that FC was aware of the illegality of its business model when it contracted with Tekstar in April 2008.

## D.

FC claims that Qwest has suffered no damages. First, it asserts that Qwest cannot recover because the 50 Percent Rule was neither a mitigation strategy nor routine least cost routing, and was therefore unforeseeable. The district court found that FC "knew, during the relevant time period, that it was possible that Qwest was

-11-

least cost routing [its] calls" because "Tekstar would be billing Qwest tariff rates and other [long-distance carriers] less than tariff rates." On appeal, FC claims this determination was clearly erroneous because "the only damage 'arising naturally from [Tekstar's] breach would be Qwest's payment of some or all of Tekstar's inflated bills"—bills that Qwest did not pay. We disagree. "[C]onsequential damages flow naturally from the breach" and are recoverable if they were "reasonably foreseeable to the parties at the time of the breach." DeRosier v. Util. Sys. of Am., Inc., 780 N.W.2d 1, 4–5 (Minn. Ct. App. 2010). In finding that Qwest's least cost routing costs were foreseeable, the district court reasoned that least cost routing was a common industry practice, and that FC suspected Qwest was least cost routing FC's calls to other long-distance carriers. The district court also found that FC knew Tekstar would be billing Qwest at tariff rates while charging other long-distance carriers below-tariff rates, and that FC's contract with Tekstar would likely cause Qwest to least cost route FC's free conferencing traffic to other carriers at below-tariff rates. The district court did not clearly err in determining that Qwest's damages arose naturally from the breach that FC induced.

FC next argues that Qwest has no damages because the nearly $1 million that Qwest paid other long-distance carriers to transmit FC's traffic is equal to the amount Qwest would have had to pay Tekstar for the same traffic, i.e. the "just and reasonable" rate. See Farmers II, 24 F.C.C. Rcd. at 14812 & n.96 (clarifying that just because the local carrier breached the tariff does not mean that the local carrier "is precluded from receiving any compensation at all for the services it has provided to Qwest"). But see All Am. Tel. Co. v. AT&T Corp., 26 F.C.C. Rcd. 723, 731 (2011) (noting that Farmers II "does not hold that a carrier is always entitled to some compensation for a service rendered, even if the service is not specified in its tariff"). But, as the district court explained:

> Tekstar's below-tariff agreements with other [long-distance carriers] contributed to Qwest routing calls to those [carriers] through [least cost

-12-

routing], which, in turn caused Qwest to pay for [FC's] calls through [least cost routing] when Qwest should not have been required to pay for the calls at all. However, the breach that proximately caused the [least cost routing] damages in the first place was that Tekstar billed Qwest anything at all for the calls to [free conferencing companies] when the tariffs established that the rate should have been zero.

The district court found that FC's "interference with Tekstar's tariffs caused Qwest to [least cost route] traffic that, if Tekstar had not breached its tariffs, Qwest would have delivered directly to Tekstar with no payment to Tekstar."[9] We see no clear error in the district court's finding that the nearly $1 million Qwest paid to AT&T and other long-distance carriers to route FC's traffic flowed directly from FC's tortious interference.

### III.

Finally, FC contests the district court's award of attorneys' fees to Qwest. Minnesota follows the American rule,[10] but provides a "third-party litigation exception." Kallok, 573 N.W.2d at 363. The exception applies "where the natural and proximate consequence of a person's tortious act projects another into litigation with a third person." Id. (quoting Prior Lake State Bank v. Groth, 108 N.W.2d 619, 622 (Minn. 1961)). The district court determined that, by inducing Tekstar to breach its tariff, FC projected Qwest into litigation against Tekstar to enforce the tariff. The court then apportioned attorneys' fees based on the proportion of free conferencing traffic attributable to FC. We see no error in that determination.

---

[9]This is because Qwest's refusal to pay Tekstar for free conferencing traffic was ultimately vindicated in Farmers II.

[10]"The American rule prevents a party from shifting its attorney fees to its adversary without a specific contract or statutory authorization." Kallok, 573 N.W.2d at 363.

# IV.

The judgment of the district court is affirmed.

SHEPHERD, Circuit Judge, dissenting.

> "'[A]s a federal court, our role in diversity cases is to interpret state law, not to fashion it.' When dealing with an issue of state law we are bound by rulings on that issue from the state's highest court . . . regardless of whether we think it wise or in accordance with the supposed national trend. If the [state] Supreme Court or legislature wants to change state law, then they can do so - we cannot."

Simmons Foods, Inc. v. Indus. Risk Insurers, 863 F.3d 792, 798 (8th Cir. 2017) (citations omitted) (quoting Wivell v. Wells Fargo Bank, N.A., 723 F.3d 887, 896 (8th Cir. 2014)).

The district court and the majority depart from this bedrock precept and, contrary to Minnesota law and with minimal explanation, find tortious interference by Free Conferencing Corp. ("Free Conferencing") where it did not induce the breach by Tekstar of its contract with Qwest Communications Company, LLC ("Qwest") and where Tekstar willingly participated in the breach, even preparing the contract and amended contract with Free Conferencing which Qwest now cites as constituting this tortious interference. For this reason, and taking the district court's factual findings as true, Qwest's claim for tortious interference with contractual relations fails, I respectfully dissent.

Under Minnesota law, a tortious interference claim requires five elements: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages."

-14-

Sysdyne Corp. v. Rousslang, 860 N.W.2d 347, 351 (Minn. 2015) (internal quotation marks omitted). Free Conferencing raises challenges across these elements. But I address only one. I conclude that the district court's decision did not properly address the third element: an intentional procurement of the purported breach in this case. Instead, the district court, sanctioned by the majority, collapses the unique contours of Minnesota law into more general tort law principles, effectively fashioning Minnesota law instead of applying it.

In reviewing a bench trial judgment on interference claims, courts "review the district court's factual findings and credibility determinations for clear error, and its legal conclusions de novo." See Qwest Commc'ns Corp. v. Free Conferencing Corp., 837 F.3d 889, 895 (8th Cir. 2016).

The Minnesota Supreme Court has often used the words "procure" and "induce" interchangeably. See, e.g., Jensen v. Lundorff, 103 N.W.2d 877, 890 (Minn. 1960). Historically, tortious interference in Minnesota (and elsewhere) was meant to guard against scheming and opprobrious commercial conduct. As the Minnesota Supreme Court explained in an early opinion, "[f]raud, misrepresentation, intimidation, coercion, obstruction, molestation, or the willful and intentional procurement of violation of contractual relations are practices which competition does not authorize." Sorenson v. Chevrolet Motor Co., 214 N.W. 754, 756 (Minn. 1927). And so the tort was meant to protect "[f]ull, fair and free competition . . . necessary to the economic life of a community" by ensuring that "unlawful means" were not used to "prevent another from obtaining the fruits of his labor." Johnson v. Gustafson, 277 N.W. 252, 254-55 (Minn. 1938).

In more recent years, the Minnesota Supreme Court has expanded the range of conduct covered by tortious interference. See, e.g., Nordling v. N. States Power Co., 478 N.W.2d 498, 506 (Minn. 1991) (noting "bad motive or malice may not be an element of the tort of tortious interference"). Even as recent cases have led to a more

fluid inquiry, Minnesota still maintains that a defendant must induce the breach of contract. See E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 678 F.3d 659, 664-65 (8th Cir. 2012) (noting Minnesota law "expressly" demands "procurement of a breach of contract" for "a tortious interference claim"). Indeed, to require anything less would not only unmoor tortious interference from its historical anchors, but also infringe on the "[l]iberty of contract . . . assured by both [Minnesota] and federal Constitutions." Minn. Wheat Growers' Co-op. Mktg. Ass'n v. Radke, 204 N.W. 314, 315 (Minn. 1925).

Underscoring how vital inducement is, Minnesota does not recognize tortious interference where the breaching party was a "willing participant[]" in the breach.[11] Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 27 (Minn. 1982). Willing participants voluntarily breach their contract with the plaintiff without any inducement by the defendant. See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632 (Minn. 1982) (rejecting tortious interference claim where "there has been no showing that [defendant] induced [breaching party] to break with [plaintiff]"); Salon 2000, Inc. v. Dauwalter, No. A06-1227, 2007 WL 1599223, at *5 (Minn. Ct. App. June 5, 2007) (no tortious interference where defendant "did nothing to induce [breaching party] to breach her agreement with [plaintiff]").

This Court recently addressed an analogous dispute between Qwest and Free Conferencing under South Dakota law. Qwest, 837 F.3d at 896. Writing for the panel, Judge Bright stressed that, for Free Conferencing's actions to be unlawful, it must have wrongfully induced a breach of contract "by act[ing] with an improper purpose." Id. But where, as here, Free Conferencing merely "take[s] advantage" of

---

[11]Contrary to the majority's contention, the argument that Tekstar was a "willing participant" in the breach is fairly included in Free Conferencing's appeal. In its briefing, Free Conferencing included an argument section asserting that "FC Did Not Induce, Procure, Or Otherwise Cause Tekstar to Materially Breach Its Tariff." Br. of Appellant, p. 26.

a regulatory system through a voluntary business relationship, it cannot be said to be "*knowingly* interfer[ing] with the contract" such that liability for an intentional tort is proper. Id. at 896-97.

The district court held that "Tekstar materially breached its tariffs" by billing Qwest for Free Conferencing's traffic. D. Ct. Op. at 66. And Free Conferencing "intentionally induced" this breach, according to the district court, by "enter[ing] into the contract [with Tekstar], direct[ing] its traffic to Tekstar, and requir[ing] that [Free Conferencing] receive telecommunications services from Tekstar for free." D. Ct. Op. at 72-73. At base, the district court reasoned that the breach of the Tekstar-Qwest tariff was caused by the initial Tekstar-Free Conferencing contract. Assuming that is true, the district court still needed to show how Free Conferencing induced Tekstar to enter into their contract.

In its conclusions of law, the district court did not do so. In discussing inducement, it leaned heavily on the fact that Free Conferencing knew about Tekstar's interexchange carrier ("IXC") contracts, including with Qwest, and settlements. But "mere knowledge of [an] earlier contract" has never been "held to be the equivalent of inducement or persuasion or (still less) of fraudulent conduct." Radke, 204 N.W. at 315 (internal quotation marks omitted); see also Royal Realty Co. v. Levin, 69 N.W.2d 667, 672 (Minn. 1955) ("It is not enough that the defendants merely knew of the contractual relationship and obtained its benefits for themselves.").[12] The district court also noted that Free Conferencing "proposed that

---

[12]The district court, citing the Restatement, found that "intent is also established if 'the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action.'" D. Ct. Op. at 71 (quoting Restatement (Second) of Torts § 766 cmt. j (1979)). But, for this to be true, the Restatement requires some malevolent inducement: "[i]f the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some

-17-

the two companies do business together." However, the recruiting of Free Conferencing by Tekstar was, by then, clearly in keeping with Tekstar's business plan.

Tekstar first started dealing with free conferencing service companies in 2005 and by 2008, Tekstar was fully immersed in the revenue stream they provided. According to the district court, Tekstar had experience with no less than eight free call service companies ("FCSC") by this time.[13] In fact, it had a form contract it routinely used with its FCSC partners. And it was hungry for more. Like many searching for greater fortune, Tekstar sent a representative, David Schornack, to Las Vegas. But, it believed he had better odds than most who visit: Schornack was there to attend a conference for FCSCs. As the district court explained, Schornack "attend[ed], in part, to network with new conference calling companies." It was at this conference in 2008 that Tekstar was introduced to Free Conferencing.

Fortuitous seating led to the meeting. In a break between panels, Schornack and Free Conferencing's David Erickson, seated next to each other, struck up a conversation. During that conversation, Schornack "outlined . . . the benefits of doing business with Tekstar." Tr. 582-83. Erickson was also eager to do business, as the district court notes. Pretty quickly after that conversation, Free Conferencing became the latest in Tekstar's stable of FCSC partners. In April 2008, Free Conferencing signed Tekstar's form contract with a per-minute rate owed on Free Conferencing traffic, along with contact information, simply written in.

---

interest of his own, the fact that he is aware that he will cause interference" is not sufficient for intent. Restatement (Second) of Torts § 766 cmt. j (1979). Regardless, the Restatement is not binding on us; the Minnesota Supreme Court is. See Hazen v. Pasley, 768 F.2d 226, 228 (8th Cir. 1985) (emphasizing that a federal court in diversity is bound to apply the "legal mind" of the state's highest court, even if it means reversing the district court).

[13]Free Conferencing suggests the number is as high as 20.

-18-

In December 2008, however, at Tekstar's behest, Free Conferencing signed an amended contract (also prepared by Tekstar). The amended contract was in response to the settlements Tekstar had reached with IXCs who had become wise to the FCSC model. The amended contract set a differentiated payment schedule based on these settlements. In addition, it ensured Tekstar was only obliged to pay Free Conferencing after it collected from the IXCs.

These facts show that Tekstar was a willing participant in the breach. Start with Schornack's testimony. Recall he was the Tekstar representative who first engaged and negotiated with Free Conferencing. When asked specifically if "Free Conferencing [did] anything to induce, persuade, or encourage Tekstar to do business with Free Conferencing," he replied: "No." Tr. 585. And when asked if Free Conferencing did anything "more than passively provide Tekstar with information about Free Conferencing's business," he, again, replied: "No, I don't think they did anything other than that." Tr. 585.

Critically, nothing in the district court's findings of fact contradicts this testimony. As the district court recounts, the genesis of the Tekstar-Free Conferencing relationship was Tekstar's decision to seek out more FCSC relationships in Las Vegas. The FCSC model had already proven quite lucrative for Tekstar for approximately three years at that point. And when Free Conferencing was ultimately added to Tekstar's roster of FCSCs, as a sign of Tekstar's familiarity with the practice, it was Tekstar's form contract—which, as a standard term, provided that Tekstar would not charge for telecom services—that was signed.[14] Further, when the business dynamics changed—when IXCs began demanding below-tariff settlements—Tekstar modified the terms of the contract with Free Conferencing to be more favorable to Tekstar. Given Schornack's testimony and the findings of the

---

[14]As the district court notes, Free Conferencing also had its own form contract, but that was not used.

-19-

district court, we cannot escape the conclusion that Tekstar was, at the least, a "willing participant[]" in its breach of the Qwest tariffs with Free Conferencing. Furlev, 325 N.W.2d at 27.

In sum, the record is devoid of legally sufficient evidence that Free Conferencing induced Tekstar to enter into their initial contract. Qwest's claim, therefore, fails under Minnesota law.

Often, in diversity cases, federal courts are tasked with interpreting and applying state law in areas in which there is little instructive state case law to draw from. But that is not the case here. Minnesota's highest court has spoken about what Minnesota requires for an intentional procurement of a breach necessary to sustain a tortious interference claim. We are duty-bound to follow the Minnesota Supreme Court.

Mindful of the duty of a federal court sitting in diversity to apply the law of the state as it is, not as the court may wish it to be, I would reverse the district court's judgment against Free Conferencing.

_____