# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1867

_____

Tara C. McNeally

*Plaintiff - Appellant*

v.

HomeTown Bank; Lindsey Puffer, Branch Manager and Vice President, in her individual capacity; Shakopee Public Schools, Independent School District No. 720; Shakopee Public Schools Board; Michael Redmond, Superintendent, in his individual capacity; Kristi Peterson, Board Chair, in her individual capacity

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: February 11, 2025
Filed: October 20, 2025

_____

Before SMITH, KELLY, and KOBES, Circuit Judges.

_____

KOBES, Circuit Judge.

Tara McNeally brought a First Amendment retaliation claim against HomeTown Bank and Shakopee Public Schools (SPS) officials under 42 U.S.C. § 1983, alleging that the bank and SPS worked together to fire her after she posted on social media criticizing school mask policies. She named the Bank, Bank Vice

President Lindsey Puffer, SPS Superintendent Michael Redmond, SPS Board Chair Kristi Peterson, and SPS as defendants.  She also brought a tortious interference with contract claim against Redmond under Minnesota law.  The district court granted summary judgment to all defendants.  We affirm in part and reverse in part.

I.

In exchange for $300,000 in money and services over five years, SPS allowed the Bank to operate a branch at Shakopee High School.  In early 2020, the Bank hired McNeally to work in two branch offices, including the one at the high school.  Superintendent Redmond was informally involved in her hiring, but McNeally worked for the Bank.  She spent about six to eight hours at the school branch each week and the rest of her time at the other location.  The Bank paid her salary and gave her good to excellent performance ratings.

McNeally's two children attend SPS schools.  She went to a Board meeting on August 23, 2021 where the Board unanimously approved a mask mandate for the upcoming school year.  On September 1, McNeally confronted Peterson over SPS's mask policy at a parent-teacher event in what Peterson described as not "civil discourse."  McNeally told Peterson she would vote for an upcoming levy in the November election but only if SPS rescinded the mask policy.

On September 7, McNeally attended a meet-and-greet at her child's elementary school as a member of the Parent Teacher Organization and as a Bank employee.  Another parent confronted her for not wearing a mask.  McNeally told Puffer about the interaction.  The next day, McNeally resigned from the PTO, and the school's principal reported the incident to Redmond.

There was another school board meeting on September 13.  Masking was on the agenda.  McNeally did not speak but held a sign, "MASKS = NO LEVY."  The Board again voted to approve the mask mandate.

McNeally went to another board meeting on September 27. Afterwards, McNeally posted a public comment on her state legislator's Facebook page:

> I personally was really disappointed in board member Kristi Peterson tonight. She was turning around to watch the clock time while Amanda was speaking about her daughters struggle with her disability and masking. She did it multiple times! So rude. I know that most people don't have ill will towards these children . . . . but that lady showed she has NO HEART! Who does that???

The next day, Puffer and Redmond met for lunch. They discussed McNeally and her Facebook post for about ten minutes. Redmond said he found the post "somewhat distasteful" and told Puffer, "you can do whatever you want with [the post]. If it were my employee, I would just want to be made aware of it." Redmond continued, "if [you] d[o] talk to [McNeally]," ask her "to take it down." But he "reiterated" at the end, he was "ask[ing] as a business partner" and "in no way . . . telling [Puffer] what to do."

Immediately after lunch, Puffer texted McNeally: "Hey . . . any way you could take down your post on Kristi Peterson? We'll talk later about it . . . but the school is pretty upset." McNeally asked who "the school" was, and Puffer responded, "District offices . . . dang."

Later that afternoon, McNeally and Puffer met at the bank. McNeally again asked who was complaining and claims Puffer responded: "Well, Kristi Peterson and another board member." Puffer denies this statement. Redmond claims he and Puffer spoke briefly that evening, and Puffer told him that her conversation with McNeally had not gone well. Puffer denies this too.

The next day, a reporter contacted McNeally about her post. McNeally told the reporter that Peterson and another school board member contacted the Bank to have McNeally take the post down. The reporter talked to Peterson, who denied contacting the Bank. Peterson also talked to Redmond. The two "mostly discussed"

McNeally's statement to the reporter, but also "other events" with McNeally—like "screaming at West [Middle School]" and the "meltdown at Sweeney [Elementary]." Peterson says that the two did not discuss contacting the Bank, while Redmond says "it's possible" they did.

That afternoon, Redmond called Puffer. He asked to meet with Puffer and McNeally, but Puffer said that because it was an "employee matter" she preferred that Redmond spoke to her first. The two agreed to meet at a coffee shop near the Bank because "it was close to the time [McNeally] would be coming back [to the Bank] from the high school." Redmond told Puffer about McNeally's statement to the reporter and that, because of McNeally's "erratic behavior incidents," "numerous complaints from teachers with the post," and the false report, he would not allow McNeally to work with students or at the Bank's high school branch. Puffer asked Redmond to "follow up with something in writing."

Redmond "hastily" wrote:

Ms. Puffer:

It has been reported to me that Tara Mcnealy [sic] has made a post on social media (I believe on Facebook) that is very inappropriate and demeaning. The subject of this post is School Board Chair, Kristi Peterson. The characterization in this post is untrue. If this same post were made by an employee of Shakopee Public Schools, it would be considered insubordination, and the event would be referred to our Human Resources Department for appropriate disciplinary action.

A copy of the post attributed to Ms. Mcnealy is below:

[screenshot of post]

It has also been reported to me that Tara Mcnealy has reached out to some form of media and wrongly accused Kristi Peterson of contacting HomeTown Bank regarding this matter.

-4-

> Effective[] immediately, until such time as an investigation of this allegation has been completed by HomeTown Bank and Shakopee Public Schools, I am requesting you to direct Tara Mcnealy to not be present in the school zone, or any school building, in any capacity of the school district and bank partnership. As Ms. Mcnealy is a parent of two students attending Shakopee Public Schools, she may certainly be present at Sweeney Elementary and West Middle School in the role of a parent. She may not be present in any other part of the school district, without my express permission, until the investigation is concluded.

Redmond says he wrote this after Puffer told him McNeally would be placed on leave and investigated by the Bank.

Puffer returned to the Bank and called the Bank President and a Human Resource representative. The three had a lengthy phone conversation about McNeally. Puffer told them about McNeally's post, her false report to the newspaper, the incident at Sweeney Elementary, and what McNeally told her about the conversation with Peterson in early September. Puffer also told them she was waiting for a letter she "had requested" from Redmond banning McNeally from SPS property. While the three were on the phone, Redmond sent the letter and Puffer forwarded it to the other two. Redmond told Puffer that she could share the letter with McNeally. Puffer then called McNeally, told her that she was suspended without pay, and sent her the letter.

The next day, Redmond emailed the SPS School Board about McNeally. He wrote that he "ha[d] done what [he] would do in any similar employee matter." He also "add[ed] that the first step in this particular situation was an attempt by the direct supervisor and [himself] to allow [McNeally] to make some form of attempt to make right [her] inappropriate actions. Instead . . . [she] reached out to a form of media and other allies of various sorts."

After suspending McNeally, the Bank received hundreds of harassing phone calls. The Bank investigated McNeally and concluded that she had violated the Bank's standard of conduct and social media guidelines, could not perform job

duties because she was banned from SPS, and improperly used her work time. She was fired on October 12.

## II.

We review the district court's decision to grant summary judgment *de novo*. *Yassin v. Weyker*, 39 F.4th 1086, 1089 (8th Cir. 2022). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows no genuine [dispute] of material fact exists and the moving party is entitled to judgment as a matter of law." *Id.* (cleaned up); *see* Fed. R. Civ. P. 56(a). "Summary judgment should not be granted if on the evidence a reasonable jury could find for the nonmoving party." *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1116 (8th Cir. 1997) (citation omitted).

### A. First Amendment Retaliation

#### 1. Superintendent Redmond

Redmond argues that he is entitled to qualified immunity because McNeally failed to show a First Amendment violation and—even if she did—the law is not clearly established. *See Joseph v. Wheeler*, 144 F.4th 1111, 1113 (8th Cir. 2025) ("[Qualified immunity] shields government officials from liability when their conduct does not violate clearly established constitutional rights of which a reasonable person would have known." (citation omitted)).

#### Constitutional Violation

We first consider whether McNeally has the First Amendment rights of an ordinary citizen or those of a government employee or contractor. In *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the Supreme Court held that a government employee's rights depend on the "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the

interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." In *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 673 (1996), the Court extended *Pickering* to government contractors and adjusted the balancing test "to weigh the government's interests as contractor rather than as employer." The district court applied *Pickering* to McNeally's claim because it found she provided services to SPS that implicate "heightened government interests." But McNeally provided services to SPS in her capacity as a bank employee, and there is no evidence to support a finding that the Bank is a government contractor.

In both *Pickering* and *Umbehr*, "the government agreed to pay public moneys to private individuals for services to be rendered, and therefore had a stronger interest in restricting those individuals' speech than in restricting the speech of the public at large." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 38 (2d Cir. 2018). "[O]ur cases consistently recognize that the government, *when acting in its role as employer*, may interfere with its employees'" First Amendment rights. *Int'l Ass'n of Firefighters, Local No. 3808 v. City of Kansas City*, 220 F.3d 969, 974 (8th Cir. 2000) (emphasis added); *see also Heritage Constructors, Inc. v. City of Greenwood*, 545 F.3d 599, 602 (8th Cir. 2008) (describing retaliation cases where "the government[] w[as] not acting . . . as [an] employer[] or contractor[]" as "inapposite").

*Destito* provides guidance. There, the Second Circuit rejected the argument that providing a vendor access to a government forum made the vendor a government contractor. *Destito*, 879 F.3d at 38. SPS "provides . . . access to a forum—an issue governed by forum doctrine, not *Umbehr*—" and "the only monetary exchange between the [Bank] and [SPS] is . . . paid *by* the [Bank] *to* [SPS]." *Id.* So the Bank is better described as a "private entit[y] that pay[s] to access public benefits and, in using those benefits to their economic advantage, secondarily satisf[ies] a government purpose." *Id.* Categorizing the Bank as a "government contractor would represent a considerable and . . . unwarranted expansion of *Umbehr*." *Id.* McNeally worked for the Bank, not the government.

-7-

McNeally argues that Redmond retaliated against her because of her speech. "To establish a First Amendment retaliation claim, [she] must show that '(1) [s]he engaged in a protected activity, (2) the government official took adverse action against [her] that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity.'" *Rinne v. Camden County*, 65 F.4th 378, 383 (8th Cir. 2023) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). As an ordinary citizen, there is no dispute that McNeally engaged in protected speech.

McNeally argues that the SPS property ban was an adverse action that would chill a person of ordinary firmness from continuing her political speech. Government action that engages "'the punitive machinery of government' to impose 'concrete consequences' in retaliation for speaking out against the government" chills speech, while "non-actionable retaliatory measures that produce only 'embarrassment, humiliation and emotional distress'" do not. *Id.* at 384 (citations omitted). We have held that "[a] prohibition on entering county property is a concrete consequence that would objectively chill a person of ordinary firmness from criticizing county commissioners." *Id.* The same applies to a ban from public school property.

Although the district court found that McNeally was banned from SPS property only as a Bank employee, a jury could find otherwise. Redmond's letter creates a caveat for McNeally to be at her children's schools "in the role of a parent," but it also says that she is banned from SPS property "in any capacity of the school district and bank partnership" and that she "may not be present in any other part of the school district, without [Redmond's] express permission, until the investigation is concluded." An online article reported that SPS "clarified" the ban: "Should there be a desire or need for additional activity as a parent, this is typically acceptable. For example, a parent in this situation can certainly attend a school board meeting." McNeally admits she read the article but says she still did not "feel comfortable being anywhere in those buildings" because she was under investigation, though she

voted at the high school in November. But "[t]he 'ordinary-firmness' test is objective . . . so the question is not simply whether the plaintiff [herself] was," or was not, "deterred." *Rinne*, 65 F.4th at 384. McNeally has pointed to enough evidence to allow a jury to decide "whether the ban would have chilled a person of ordinary firmness from continuing to speak." *Id.*

Finally, McNeally argues that a reasonable jury could find that Redmond's retaliatory motive "was a 'but-for cause' of the adverse action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)). Redmond counters that McNeally's "erratic behavior" was the cause of his letter banning her from SPS property. Maybe, but his letter focused on McNeally's speech, calling it "very inappropriate and demeaning" and suggesting the post would warrant "disciplinary action" if made by an SPS employee. The parties also dispute whether McNeally falsely accused Peterson of trying to get the Bank to take down the post. While the jury may believe Redmond's claim that he was not motivated by McNeally's speech, we cannot say this "question is so free from doubt as to justify taking it from the jury." *Peterson v. Kopp*, 754 F.3d 594, 603 (8th Cir. 2014) (citation omitted).

Clearly Established

The district court held "there is no clearly established law that a superintendent cannot temporarily ban a person employed on school grounds from school property in their employee capacity with a private employer during an investigation into their allegedly improper conduct." But the extent of the ban is disputed, and when it took effect it was clearly established that a government official may not retaliate against a citizen for the exercise of her First Amendment rights. *Pendleton v. St. Louis County*, 178 F.3d 1007, 1011 (8th Cir. 1999); *see also Waddell v. Forney*, 108 F.3d 889, 894 (8th Cir. 1997) (considering a Fifth Amendment due process claim and stating that since "1989, the right to be free from government interference with an employment relation was clearly established" (citing *Chernin*

*v. Lyng*, 874 F.2d 501 (8th Cir. 1989))). We have also held that a government official may not ban someone from government property in retaliation for speech. *Rinne*, 65 F.4th at 385; *see Hartman v. Moore*, 547 U.S. 250, 256 (2006) (explaining that while some official actions "might well be unexceptional if taken on other grounds," such adverse action cannot be taken in retaliation for speech). And when Redmond allegedly conspired with the Bank, it was clearly established that a government official could not engage in "conduct in furtherance of a conspiracy to retaliate against Plaintiffs for exercising their First Amendment rights." *Pendleton*, 178 F.3d at 1011. So Redmond was "on notice" that his alleged retaliatory conduct was unlawful. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

## 2. Puffer and the Bank

Generally, only state actors may be held liable under § 1983, but when a "private actor 'is a willful participant in joint activity with the State or its agents' in denying a plaintiff's constitutional rights," the private actor may be liable. *Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). To survive a motion for summary judgment, McNeally had to produce evidence from which reasonable jurors could conclude that "there was a mutual understanding, or meeting of the minds between the [Bank] and [SPS]" to retaliate against McNeally for her protected speech. *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993); *see also Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) ("Private persons, jointly engaged with state officials in the challenged action, are acting . . . 'under color' of law for purposes of § 1983 actions.").

The district court held there was no evidence that "Redmond and Puffer hatched a plan to retaliate against [McNeally]" or that "anyone from [SPS] asked the Bank Defendants to suspend and later terminate McNeally." But there is at least circumstantial evidence that Redmond pushed to have McNeally disciplined or that Puffer acted together with Redmond to retaliate against McNeally for her social media post. The two were in close communication from the time Redmond told Puffer about the post at lunch. Puffer then asked McNeally to take down the post

because the school was upset, later telling Redmond that her conversation with McNeally did not go well. During their coffeeshop conversation the next day, Redmond told Puffer that he would not allow McNeally to work with students or at the Bank's high school branch, because of her behavior, complaints about her post, and the false report. And Puffer told him that she planned to place McNeally on leave. McNeally emailed the ban to Puffer that afternoon, at her request. The ban lasted until the bank and the school completed their investigations. A jury could find that the frequent communication between Redmond and Puffer, including evidence of coordination in the decisions to ban McNeally and place her on leave, shows a mutual understanding to retaliate against McNeally for her protected speech. *See Dean v. County of Gage*, 807 F.3d 931, 940 (8th Cir. 2015) (frequent communication is evidence of meeting of the minds); *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 957 (8th Cir. 2023) (coordination between two parties can support meeting of the minds).

### 3. Peterson

McNeally argues that Peterson can be held liable for the retaliatory actions because of Peterson's involvement in McNeally's termination. McNeally must show Peterson's "personal involvement in the alleged violation." *Molina v. City of St. Louis*, 59 F.4th 334, 344 (8th Cir. 2023) (citation omitted). Peterson "cannot be held liable under section 1983 for the wrongdoing of others." *Beard v. Falkenrath*, 97 F.4th 1109, 1122 (8th Cir. 2024).

Peterson admits she was upset by McNeally's post but denies talking to the Bank after the media reached out. Redmond does not recall whether the two discussed contacting the Bank but said "it's possible." "[N]ot recall[ing] an event does not itself create a question of material fact about whether the event did, in fact, occur." *To v. US Bancorp*, 651 F.3d 888, 892 n.2 (8th Cir. 2011). That Peterson and Redmond discussed the post in the middle of the communications between Redmond and Puffer is not sufficient to show that Peterson took action against McNeally.

## 4. SPS

McNeally argues SPS may be liable for the retaliation based on SPS's custom, policy, or practice. *See Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978). We disagree. Custom requires evidence of "a continuing, widespread, and persistent pattern of unconstitutional misconduct," which McNeally has not produced. *Bolderson v. City of Wentzville*, 840 F.3d 982, 986 (8th Cir. 2016). And though "'an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business' . . . '[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Davison v. City of Minneapolis*, 490 F.3d 648, 659 (8th Cir. 2007) (citations omitted) (plurality opinion). Redmond, as superintendent, lacks final policymaking authority. *See* Minn. Stat. § 123B.143 (superintendent "shall be an ex officio nonvoting member of the school board"); *Minnesota Educ. Ass'n v. Bennett*, 321 N.W.2d 395, 398 (Minn. 1982) (collecting caselaw supporting the "holding that a superintendent of schools is not a part of the school district's governing body"); *Springdale Educ. Ass'n v. Springdale Sch. Dist.*, 133 F.3d 649, 652 (8th Cir. 1998) ("Whether a person is an authorized policymaker for purposes of assigning municipal liability is a question of state law.").

## B. Tortious Interference

McNeally also pleaded that Redmond tortiously interfered with her employment at the Bank. Tortious interference with a contract requires "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Sysdyne Corp. v. Rousslang*, 860 N.W.2d 347, 351 (Minn. 2015) (citation omitted). The parties dispute the intentional procurement element and whether Redmond is entitled to official immunity.

-12-

To show intentional procurement McNeally "must prove that [Redmond] *caused* the [Bank] to breach its contract." *Qwest Commc'ns Co., LLC v. Free Conferencing Corp.*, 905 F.3d 1068, 1074 (8th Cir. 2018). Whether Redmond's retaliatory motive was the but-for cause of the Bank's alleged breach of contract in firing McNeally is a genuine dispute of fact.

Redmond claims official immunity, but he is not entitled to it. Under Minnesota's official immunity doctrine, "public officials performing such discretionary duties generally have immunity except when they are 'guilty of a willful or malicious wrong.'" *Jepsen v. City of Pope*, 966 N.W.2d 472, 485 (Minn. 2021) (citation omitted). An official violating "clearly established" law commits a willful or malicious wrong, thus losing his official immunity. *See Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 662 (Minn. 2004).

## III.

We affirm the grant of summary judgment in favor of Peterson and SPS. We reverse the grant of summary judgment on the First Amendment claims against Puffer, the Bank, and Redmond and the state law claim against Redmond. The case is remanded for proceedings consistent with this opinion.

KELLY, Circuit Judge, concurring, and concurring in the judgment.

In my view, the proper framework for evaluating McNeally's First Amendment claims against defendants is set forth in Pickering v. Bd. of Educ. because the relationship between SPS and McNeally is much closer to an employer-to-employee relationship than it is a sovereign-to-citizen relationship. 391 U.S. 563, 568 (1968); see also L.L. Nelson Enters., Inc. v. County of St. Louis, 673 F.3d 799, 808 (8th Cir. 2012). For this reason, while I concur in Parts II.A.3 and A.4, and II.B. of the court's opinion, I concur only in the judgment as to Parts II.A.1-2.

"[A] governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general

public." City of San Diego v. Roe, 543 U.S. 77, 80 (2004). That is so because "the State's interests as an employer in regulating the speech of its employees 'differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" Connick v. Myers, 461 U.S. 138, 140 (1983) (quoting Pickering, 391 U.S. at 568). To accommodate the government's interests as an employer, Pickering instructs us to balance these interests with the individual's free speech interests. See 391 U.S. at 568–73; see also Anzaldua v. Ne. Ambulance and Fire Prot. Dist., 793 F.3d 822, 835 (8th Cir. 2015) (listing the "six interrelated factors" relevant to Pickering's balancing inquiry).

Pickering's balancing test is not limited to public employees. See, e.g., Bd. of Cnty. Comm'rs v. Umbehr, 518 U.S. 668, 678–79 (1996) (applying Pickering to government contractor); Smith v. Cleburne Cnty. Hosp., 870 F.2d 1375, 1381 (8th Cir. 1989) (applying Pickering to independent contractor of hospital because "[w]hile there [was] not a direct salaried employment relationship, there is an association between the independent contractor doctor and the Hospital that have similarities to that of an employer-employee relationship"). Instead, in determining whether Pickering applies, we have "distinguished between the government's role as employer or contractor and the government's role as sovereign." L.L. Nelson Enters., Inc., 673 F.3d at 808; see also Riley's Am. Heritage Farms v. Elsasser, 32 F.4th 707, 720–21 (9th Cir. 2022) (characterizing government action in its role as licensor as sovereign action).

Here, McNeally's relationship with SPS "implicates governmental interests similar to those involved in the public employment context." See Kinney v. Weaver, 367 F.3d 337, 360–61 (5th Cir. 2004) (applying Pickering to police instructors because "[l]aw enforcement agencies have a legitimate interest in exercising discretion over the choice of the instructors who train the officers who will, in turn, carry out the agencies' public duties") (quoting Pickering, 391 U.S. at 568); Riley's Am. Heritage Farms, 32 F.4th at 722 (applying Pickering to field trip venue given school district's interest in "ensuring the students' safety and maintaining the School District's intended curricular design for the trips"); Clairmont v. Sound Mental Health, 632 F.3d 1091, 1102 (9th Cir. 2011) (applying Pickering to domestic

violence counselor given probation office's interest in ensuring treatment was properly provided to court-ordered participants).

SPS and McNeally's direct employer, the Bank, entered into a Naming Rights Agreement in which the Bank promised to provide $300,000 worth of resources to SPS over five years, including externship and internship experiences for students. In exchange, the Bank received the exclusive right to name the project the "HomeTown Bank Academy of Business & Entrepreneurship." McNeally's role at SPS was not simply that of a personal banker at the school. Instead, she was responsible for supervising and evaluating student interns who received class credit for participating in the program. McNeally worked on efforts related to the school bank branch five days a week for a total of 12-15 hours—at least three days at the school branch, which included intern supervision—and two days a week at the main branch, where the interns would travel to work on financial literacy curricula. McNeally consulted with two teachers to ensure the students would receive academic credit for participation, and the interns and McNeally co-produced financial literacy instructional videos for elementary school students. During the summer of 2021, McNeally taught financial literacy classes to every student enrolled in summer school in the district—elementary, middle, and high school—which Puffer estimated included about four hundred students. In this way, SPS "relied on [McNeally] to provide educational services for public school students" and had an interest in "ensuring the students' safety and maintaining [SPS]'s intended curricular design for" its relationship with the Bank. Riley's Am. Heritage Farms, 32 F.4th at 722 (applying Pickering to private field trip company).

The Second Circuit's opinion in Wandering Dago, Inc. v. Destito does not change the result. 879 F.3d 20, 38 (2d Cir. 2018). There, a food truck was denied a vending permit at a summer farmers market because government officials found the name of the food truck offensive. Destito, 879 F.3d at 28. The court applied a forum analysis, concluding that the food vendors were not government contractors, but instead "private entities that pay to access public benefits and, in using those benefits to their economic advantage, secondarily satisfy a government purpose." Id. at 38. McNeally, in contrast, directly engaged with students in a public school as an

educator. The analogy to one of many food vendors who applied for permission to operate its food truck on public grounds is inapposite, if only because it fails to account for the role McNeally played in carrying out a core governmental function at the school.

True, the Destito court considered the fact that the only exchange of money was a fee the vendors paid to the government agency. Id. But that fact was by no means dispositive to the court's Pickering analysis. See id. In any event, the circumstances here are not the same. In this case, the Bank agreed to provide the school with valuable "in-kind and/or donations" and, in exchange, it was allowed to open a branch inside the school, where students and staff could open and maintain personal accounts. But as part of the Naming Rights Agreement, the Bank also agreed to take on the role of educator to SPS's students in the form of student "development programs" and "externships and internships," and it tasked McNeally with this responsibility. The education of students is a core governmental obligation, and SPS relied on McNeally to meet this obligation with respect to the credits the students received for participation in the banking program. See Waters v. Churchill, 511 U.S. 661, 675 (1994) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.")

The Supreme Court has cautioned against taking a formalistic approach in determining when Pickering applies. See Umbehr, 518 U.S. at 679 ("Determining constitutional claims on the basis of such formal distinctions, which can be manipulated largely at the will of the government agencies concerned, is an enterprise that we have consistently eschewed." (citation omitted)). To conclude that SPS was acting in its sovereign capacity here ignores the significant benefit SPS received under the contract at issue that strikes at the core of the government's interests—curricular development and instruction to its students. See Umbehr, 518 U.S. at 676 ("The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." (quoting Waters, 511 U.S. at 675)). Given her role at the school,

-16-

McNeally's relationship with SPS was more like that of an employee than a citizen or licensee, and <u>Pickering</u> applies.

Under <u>Pickering</u>, SPS has the burden to show an adverse effect on the efficiency of its operations.[1] <u>See</u> <u>Anzaldua</u>, 793 F.3d at 833; <u>but see</u> <u>Germann v. City of Kansas City</u>, 776 F.2d 761, 765 (8th Cir. 1985) ("It is not necessary 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'" (quoting <u>Connick</u>, 461 U.S. at 152)). SPS expressed legitimate concerns and predictions of harm that would flow from McNeally's Facebook post, including complaints made to Redmond by teachers at the school. SPS has proffered sufficient evidence of adverse impact to trigger <u>Pickering</u> balancing. <u>See</u> <u>Anzaldua</u>,793 F.3d at 833–35.

On this record, however, the <u>Pickering</u> balancing test is ultimately for a jury to evaluate. <u>See</u> <u>Bailey v. Dep't of Elementary & Secondary Educ.</u>, 451 F.3d 514, 518 n.2 (8th Cir. 2006) (explaining that the <u>Pickering</u> balancing test is "a question of law," but "its underlying factual questions should be [] submitted to the jury"). And, because Puffer and the Bank's liability rises and falls with the <u>Pickering</u> balancing as applied to Redmond, I agree that reversal of summary judgment as to Puffer and the Bank also is proper.

—————————————————

[1]I would assume, without deciding, that at least some of McNeally's post is on a matter of public concern. <u>See</u> <u>Anzaldua</u>, 793 F.3d at 833 (citing <u>Waters</u>, 511 U.S. at 680) (doing same).

-17-